**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **JOHN T. ("TOM") MINEMYER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 07 C 1763** |
| **v.** | ) | |
| | ) | **Magistrate Judge Cole** |
| **B-ROC REPRESENTATIVES, INC., et al.** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

The plaintiff produces plastic pipe couplers. The couplers are short lengths of sturdy plastic tube, with threads spiraling their way from both ends toward the center – think jar lid, with the lid being one end of the coupler and the pipe being the jar. In the center, there is a stop so that the pipes being connected wouldn't actually touch. On the outside there are vertical grooves – the parties call them "flutes" – that provide a gripping surface to allow for tightening during installation. The couplers come in various colors and sizes, both which are dictated by the communications companies that are the consumers of these products.

The defendants make and/or distribute couplers, too, and they are very similar, if not very nearly identical, to plaintiff's. And that's plaintiff's problem; he alleges that the defendants are violating the Lanham Act by infringing his trade dress and passing their products off as his. He claims his trade dress is, essentially, the coupler itself: its length, diameter, internal lead-in taper, flutes, arrows, the solid reinforced area between the flutes and the taper, and the base coloring of the material. But, that makes for a difficult Lanham Act claim, because the Act doesn't protect the product *per se*, but the trade dress insofar as it identifies the source of the product. In other words,

the plaintiff can't simply complain that defendants are copying his product – that's a patent infringement claim, which plaintiff does bring – but has to show that because they are copying his product, the consumer is confused as to whether the coupler they are purchasing is the plaintiff's or the defendant's.

Judge Posner explained the distinction in *Publications Intern. Ltd. v. Landoll, Inc.*, 164 F.3d 337 (7th Cir. 1998):

> On the one hand, a seller should be encouraged to make his products recognizable by consumers at a glance as *his* product and not that of another seller. This way the seller will be able to appropriate the benefits of making a product that consumers like, and so he will have an incentive to make a good product. Other sellers won't be able to free ride on his efforts by tricking the consumer into buying an inferior product from them in the belief that it is the product of the seller whom they have grounds to trust.

> On the other hand, a seller should not be allowed to obtain in the name of trade dress a monopoly over the elements of a product's appearance that either are not associated with a particular producer or that have value to consumers that is independent of identification. In the lingo of unfair competition, elements of the latter type-elements whose value is not merely signification-are a product's "functional" features; . . . Functional improvements may be patentable, or protected as trade secrets, but they cannot be appropriated in the name of trade dress even if they are distinctive.

*Id.* at 339. In short, "'exploiting the goodwill of the article – the attractive features, of whatever nature, that the product holds for consumers – is robust competition; only deceiving consumers, or exploiting the goodwill of another producer, is unfair competition.'" *Dorr-Oliver, Inc. v. Fluid-Quip, Inc.*, 94 F.3d 376, 383 (7th Cir. 1996)(quoting *Duraco Prods. v. Joy Plastic Enters., Ltd.*, 40 F.3d 1431, 1445 (3rd Cir.1994)).

The defendants feel that plaintiff is attempting to secure a monopoly over functional aspects of his product as opposed to aspects that are signifiers of source. They have moved for summary judgment on plaintiff's trade dress claims, brought under the Lanham Act and Illinois state law.

# I.
# SUMMARY JUDGMENT

## A.
## The Federal Rule of Civil Procedure and Applicable Case Law

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the initial burden to demonstrate their entitlement to summary judgment, *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). When considering a motion for summary judgment, the nonmoving party's evidence "'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'" *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999). Credibility determination must be left for the fact-finder. *Hunt*, 526 U.S. at 552.

But this favor toward the nonmoving party does not extend to drawing "[i]nferences that are supported by only speculation or conjecture." *Fischer v. Avanade, Inc.,* 519 F.3d 393, 401 (7th Cir.2008) (citation omitted). The nonmoving party "must do more than raise some metaphysical doubt as to the material facts; [she] must come forward with specific facts showing that there is a genuine issue for trial." *Keri v. Bd. of Trs. of Purdue Univ.,* 458 F.3d 620, 628 (7th Cir.2006). Where the nonmoving party bears the burden of proof at trial, he must present specific facts showing a genuine issue to survive summary judgment. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-24 (1986); *Ortiz v. John O. Butler Co.,* 94 F.3d 1121, 1124 (7th Cir.1996)("If the nonmoving party fails to establish the existence of an element essential to his case, one on which he would bear the burden of proof at trial, summary judgment must be granted to the moving party."). A genuine issue of material fact exists, precluding summary judgment, "only if sufficient evidence favoring the

3

nonmoving party exists to permit a jury to return a verdict for that party." *Sides v. City of Champaign,* 496 F.3d 820, 826 (7th Cir.2007) (citation omitted).

## B.

## Summary Judgment Under The Northern District's Local Rules

As always, the facts underlying this summary judgment proceeding are drawn from the parties' Local Rule 56.1 submissions.[1] Local Rule 56.1 requires a party seeking summary judgment to include with its motion "a statement of material facts as to which the ... party contends there is no genuine issue and that entitle the ... party to a judgment as a matter of law." Local Rule 56.1(a)(3); *Ciomber v. Cooperative Plus, Inc.,* 527 F.3d 635, 643 (7th Cir. 2008). Each paragraph must refer to the "affidavits, parts of the record, and other supporting materials" that substantiate the asserted facts. Local Rule 56.1(a)(3); *F.T.C. v. Bay Area Business Council, Inc.,* 423 F.3d 627, 633 (7th Cir. 2005). The party opposing summary judgment must then respond to the movant's statement of proposed material facts; that response must contain both "a response to each numbered paragraph in the moving party's statement," Local Rule 56.1(b)(3)(B), and a separate statement "consisting of short numbered paragraphs, of any additional facts that require the denial of summary judgment," Local Rule 56.1(b)(3)(C); *Ciomber,* 527 F.3d at 643. Again, each response, and each asserted fact, must be supported with a reference to the record. Local Rule 56.1(b)(3)(B); *Cracco v. Vitran Exp., Inc.,* 559 F.3d 625, 632 (7th Cir. 2009); *Bay Area Business Council, Inc.,* 423 F.3d at 633.

If the moving party fails to comply with the rule, the motion can be denied without further

---

[1] As the local rules governing summary judgment procedures do not affect substantive patent law principles, they are applicable in this case. *In re Cygnus Telecommunications Technology, LLC, Patent Litigation,* 536 F.3d 1343, 1351-52 (Fed.Cir. 2008).

consideration.  Local Rule 56.1(a)(3); *Smith v. Lamz*, 321 F.3d 680, 682 n.1 (7th Cir. 2003).  If the responding parting fails to comply, its additional facts may be ignored, and the properly supported facts asserted in the moving party's submission are deemed admitted.  Local Rule 56.1(b)(3)(C); *Montano v. City of Chicago*, 535 F.3d 558, 569 (7th Cir. 2008); *Cracco*, 559 F.3d at 632; *Cady v. Sheahan*, 467 F.3d 1057, 1061 (7th Cir. 2006).  District courts are "'entitled to expect strict compliance'" with Rule 56.1, and do not abuse their discretion when they opt to disregard facts presented in a manner that does follow the rule's instructions.  *Cracco*, 559 F.3d at 632; *Ciomber*, 527 F.3d at 643; *Ammons v. Aramark Unif. Servs., Inc.*, 368 F.3d 809, 817 (7th Cir.2004).

## II.
## ANALYSIS

### A.
### Trade Dress Under The Lanham Act

Plaintiff brings his Lanham Act claim under Section 43(a)(1)(A) of the Act,[2] which provides:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which-
>> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, . . .

15 U.S.C. §1125(a)(1)(A).  In *Wal-Mart Stores, Inc. v. Samara Brothers, Inc.*, 529 U.S. 205(2000), the Supreme Court held that the phrase "word, term, name, symbol, or device, or any combination thereof" includes distinctive aspects of a product's appearance, commonly known as trade dress.

---

[2] The plaintiff contends that the defendants' actions  "creat[ed] confusion as to the origin of their couplers . . . ." (*Second Amended Complaint*, ¶ 42).

That's what plaintiff is claiming for his plastic couplers in this case.

Plaintiff's claim is that the couplers themselves *are* the trade dress. That is a difficult claim to advance. Trade dress has to identify a product's source: in order to prevail, the plaintiff must demonstrate "that consumers understand the design elements to signify the goods' *origin* and not just its attributes." *Bretford Mfg., Inc. v. Smith System Mfg. Corp.*, 419 F.3d 576, 579 (7th Cir. 2005)(Emphasis supplied); *Incredible Technologies, Inc. v. Virtual Technologies, Inc.*, 400 F.3d 1007, 1015 (7th Cir. 2005)("The term trade dress refers to the "appearance of a product when that appearance is used to identify the producer."). But, "product design almost invariably serves purposes other than source identification." *Wal-Mart Stores*, 529 U.S. at 213.

There are three elements to a trade dress claim. First, the plaintiff "has the burden of proving that the matter sought to be protected is not functional." 15 U.S.C. §1125(a)(3), *TrafFix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. 23, 29 (2001).[3] "This burden of proof gives force to the well-established rule that trade dress protection may not be claimed for product features that are functional." *Id.* at 29. "Otherwise, . . . it would be too easy to use the expense and risk of litigation to dissuade rivals from using their right to reverse-engineer and copy products, which they may do down to the last detail unless a feature of the product is protected by patent, copyright, or trademark law." *Id.* (citing *TrafFix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. 23, 29 (2001); *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141 (1989); *Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225 (1964).

---

[3] Although his product has been on the market for over ten years, the plaintiff did not register his trade dress, so he is not entitled to the presumptions that registrations would have afforded. *Eco Mfg. LLC. v. Honeywell Intern., Inc.*, 357 F.3d 649, 651-52 (7th Cir. 2003).

The plaintiff also must prove the product has acquired "secondary meaning." That is, that "'in the minds of the public, the *primary* significance of a [the trade dress] is to identify the source of the product rather than the product itself.'" *Wal-Mart Stores*, 529 U.S. at 211 (emphasis supplied). "[W]hen trade dress implies the product's origin it is protected as a trademark (unless it also is functional); but when consumers value the feature for its own sake rather than as a badge of origin, it may be copied freely." *Bretford Mfg.*, 419 F.3d at 579. The idea is that the trade dress "prompt[s] the consumer who sees an article of merchandise to say, 'That's the article I want because I know its source,' not 'Who makes that article?'" *AM General Corp. v. DaimlerChrysler Corp.*, 311 F.3d 796, 815 7th Cir. 2002). Proving this, however, is unlikely. *Wal-Mart Stores*, 529 U.S. at 214. Then, if plaintiff proves both nonfunctionality and secondary meaning, he must establish one more thing: that the defendant is using the trade dress in a manner likely to cause confusion as to the origin of the goods. 15 U.S.C. §1125(a)(1)(A); *TrafFix Devices*, 532 U.S. at 28.

## B.
## Functionality

In response to defendants' interrogatory asking plaintiff to "[i]dentify each and every feature of your couplers which you contend to be distinctive, nonfunctional trade dress, including without limitation, any allegedly protectable specific shape, color, and/or surface design," plaintiff cited "[t]he length, diameter, internal lead-in taper, flutes, arrows, the solid reinforced area between the flutes and end taper, and the base coloring of the material." (Def.Ex. 5, at 9). The rub is that the plaintiff has admitted that each of these features is *functional*.

He has admitted the "internal lead-in taper" is functional. (*Defendants' Statement of*

*Material Facts*, ¶¶15-17; *Plaintiff's Rule 56.1(b) Response*, ¶¶15-17).  As he explained at his deposition:

> It's a slight taper so that you can get the pipe started into the coupler.  You have to
> have that or else you can't get the pipe in.  Without a lead-in you can't, because it's
> not perfectly round.

(Defendant. Ex. 6, Minemyer Dep., at 66).  So, without the "lead-in taper," the coupler can't function.  As the plaintiff conceded, "[y]ou have to have that . . . ."  (*Id.*)

He has also admitted that the "solid reinforced area between the flutes and end taper" is functional. (*Def.St.*, ¶ 18-20; *Pl.Resp.*, ¶¶ 18-20). The plaintiff testified that this has a functional purpose: "for strength purposes." (Defendant. Ex. 6, Minemyer Dep., at 65). If "you ran the flute all the way to the end . . . if you strike it correctly with a hammer you could propagate a crack right there because of that little indent . . . ." (*Id.*). The feature is simply "a reinforcing rib." (*Id.*). And he has conceded that the "arrows" are functional. (*Def.St.*, ¶ 21-22; *Pl.Resp.*, ¶¶ 21-22). "They tell you which way to turn it."  (Defendant. Ex. 6, Minemyer Dep., at 93).  In other words, the arrows simply indicate the direction in which to rotate the coupler in order to secure the incoming pipes.

The next feature is the coupler's "base color."  In general, color is not inherently distinctive. *Wal-Mart Stores*, 529 U.S. at 212.  Most often,  it serves an aesthetic purpose. *See Publications Intern., Ltd. v. Landoll, Inc.*, 164 F.3d 337, 339 (7th Cir. 1998)("The dye does not make the coat any warmer, but it makes it more beautiful, and, once again, it could not be claimed as trade dress by the first furrier to have hit on the idea."). Here, the colors actually serve a functional purpose, as the plaintiff admits. (*Def.St.*, ¶¶ 23-24; *Pl.Resp.*, ¶¶ 23-24). The couplers are made in colors determined by the *customers*, not the manufacturer. (*Def.St.*, ¶ 23; *Pl.Resp.*, ¶¶ 23; Defendant. Ex. 6, Minemyer

8

Dep., at 404-05). They denote the sizes of the various couplers to allow ready identification. (*Def.St.*, ¶ 24; *Pl.Resp.*, ¶ 24; Defendant. Ex. 6, Minemyer Dep., at 404). So, if AT&T and Verizon both had an inch-wide coupler, the "colors would have been different [because] [t]hey had their own color scheme." (Defendant. Ex. 6, Minemyer Dep., at 405). Consequently, the colors cannot serve to identify the source.

The "length and diameter" of the coupler are also functional. Obviously, the diameter of the coupler is dictated by the diameter of the pipe to be joined. The pipe has to fit into the coupler; the coupler has to have a somewhat larger diameter than the pipe. The diameter also has to do with the outside size of the coupler, that it is small enough to pass through "plow chutes." (*Def.St.*, ¶ 35; *Pl.Resp.*, ¶ 35). So, both the inner and outer diameters are dictated by functionality.

Similarly, the length of the coupler is linked to the amount of thread needed for a strong joint. Where "you don't need as much thread engagement, . . . it doesn't have to be as long. (*Def.St.*, ¶ 36; *Pl.Resp.*, ¶ 36; Defendant. Ex. 6, Minemyer Dep., at 245). The amount of thread, and so the length of the coupler, is the determining factor in "pull strength." (*Def.St.*, ¶ 37; *Pl.Resp.*, ¶ 37; Defendant. Ex. 6, Minemyer Dep., at 245). The coupler's length is also a factor in "lead-in"; the area of the coupler before the thread begins. It allows "the pipe [to] get started into the coupler before the thread engage[s]." (*Def.St.*, ¶ 38; *Pl.Resp.*, ¶ 38; Defendant. Ex. 6, Minemyer Dep., at 245).

The "flutes" are also functional. They are, in fact, a salient feature of the plaintiff's patent. The specification of Patent No. 6,851,726 ("726 patent") describes the flutes as providing a "gripable surface for installation by hand" and also states that "a standard wrench, for example a pipe wrench, may be used to grip flutes . . . for proper installation." (*Def.St.*, ¶ 26; *Pl.Resp.*, ¶ 26 Def.Ex.

7, col. 6, ls. 45-48). Claim 14 of the patent indicates that the flutes are functional as well, describing the "conduit coupling . . . [as] further comprising a plurality of flutes disposed upon an exterior diameter of the first connector and operable to provide a gripping surface." (*Def.St.*, ¶¶ 27-28; *Pl.Resp.*, ¶ 27-28; Def.Ex. 7, col. 6, ls. 45-48). This is "strong evidence that the features therein claimed are functional." *TrafFix Devices*, 523 U.S. at 29.

In *TrafFix Devices*, the patent had expired and, essentially, the plaintiff sought to extend its "monopoly" over its product via trade dress. The Supreme Court held that where that "patent claimed the features in question, one who seeks to establish trade dress protection must carry the heavy burden of showing the feature is not functional, for instance by showing it is merely an ornamental, incidental, or arbitrary aspect of the device." 523 U.S. at 30. At his deposition, the plaintiff explained that the "flutes" are the "longitudinal indents on the coupler" and that "[t]hey were there so that you could grip it and turn it onto the pipe." (*Def.St.*, ¶¶ 31-334; *Pl.Resp.*, ¶¶ 31-33; Defendant. Ex. 6, Minemyer Dep., at 52). He conceived of the flutes for that purpose. (Defendant. Ex. 6, Minemyer Dep., at 51-52). In short, the flutes are not "an ornamental, incidental, or arbitrary aspect" of the couplers.

The plaintiff does not offer much in the way of evidence to meet his "heavy burden" that the flutes are "ornamental, incidental, or arbitrary." He does, however, point out that the flutes are elongated rectangles, and that they might work just as well if they were elongated ovals. (*Plaintiff's Response to Defendants' Motion for Summary Judgment*, at 11). His evidence consists of an affidavit from a former sales manager of his company and photographs, taken by his attorney, of other companies' couplers with different shaped flutes. (*Id.*, citing *Plaintiff's Additional Facts*, ¶¶ 39-40). There are problems, however, with both pieces of evidence.

10

The former sales manager claims that there are other couplers that look different and that the design of the plaintiff's couplers' flutes is unique. (Maynard Aff., ¶¶ 9-10). His affidavit is not unlike the one rejected as not probative in *Gimix, Inc. v. JS & A Group, Inc.*, 699 F.2d 901, 908 (7th Cir. 1983). As for the photos taken by plaintiff's lawyer, he has become a witness as to the foundation for the photographs, *see* Rule 901, by submitting his affidavit, even though an attorney cannot simultaneously be a witness and an advocate in the same case. *Oimen v. McCaughtry*, 130 F.3d 809, 810-11 (7th Cir. 1997); Local Rule 83.53.7. [4]

But, let us assume that the design of the flutes is "unique " and that the photographs are what they purport to be and are admissible. What plaintiff is in essence arguing is that there are alternative designs for the flutes and therefore by copying his design the defendants have violated the Lanham Act. That's not a compelling argument to make in view of *TrafFix Devices*, where the Supreme Court determined that the dual-spring design on a wind-resistant road sign was functional because the dual-spring design "provides a unique and useful mechanism to resist the force of the wind." 532 U.S. at 33. The plaintiff posited alternative designs: a competitor could use three or four springs to serve the same purpose. 532 U.S. at 33. The Court rejected the alternative design argument, holding that:

> [t]here is no need, furthermore, to engage, as did the Court of Appeals, in speculation about other design possibilities, such as using three or four springs which might serve the same purpose. Here, the functionality of the spring design means that competitors need not explore whether other spring juxtapositions might be used. The

---

[4] This is not to say that counsel is *incompetent* to testify. There are limited exceptions where an attorney can testify without withdrawing from the case. But plaintiff has not argued that any of them are applicable here. *Giraldi by Giraldi v. Community Consol. School Dist. No. 62*, 279 Ill.App.3d 679, 687, 665 N.E.2d 332, 337 (1st Dist. 1996)

> dual-spring design is not an arbitrary flourish in the configuration of [the road sign]; it is the reason the device works. Other designs need not be attempted.

532 U.S. at 33-34.

After *TrafFix*, the consensus among the Circuit Courts of Appeals was that once functionality was established alternative designs were irrelevant, *Au-Tomotive Gold, Inc. v. Volkswagen of America, Inc.*, 457 F.3d 1062, 1071-72 (9th Cir. 2006); *Dippin' Dots, Inc. v. Frosty Bites Distribution, LLC*, 369 F.3d 1197, 1205 n.9 (11th Cir. 2004); *Talking Rain Beverage Co. Inc. v. South Beach Beverage Co.*, 349 F.3d 601, 604 (9th Cir. 2003); *Eppendorf-Netheler-Hinz GMBH v. Ritter GMBH*, 289 F.3d 351, 357 (5th Cir. 2002), or, at the very least, that a court need not consider them. *Antioch Co. v. Western Trimming Corp.*, 347 F.3d 150, 156 (6th Cir. 2003). *But see Valu Engineering, Inc. v. Rexnord Corp.*, 278 F.3d 1268, 1276 (Fed.Cir. 2002).[5] The plaintiff has conceded, in one fashion or another, that every feature of his coupler that he asserted to be distinctive, nonfunctional trade dress is, in fact functional. As such, his evidence of alternative designs, even if properly proffered, does not change the result.

That leaves the coupler's "overall appearance" as trade dress. There is some question as to whether this is even an issue properly in this case. Although at oral argument on the motion for summary judgment, plaintiff's counsel said that the trade dress was the overall appearance of the

---

[5] In *Valu Engineering*, the Federal Circuit discussed the holding in *TrafFix*, but found that it did "not mean that the availability of alternative designs cannot be a legitimate source of evidence to determine whether a feature is functional in the first place." 278 F.3d at 1276. Instead, the Federal Circuit "conclude[d] that the Court merely noted that once a product feature is found functional based on other considerations there is no need to consider the availability of alternative designs, because the feature cannot be given trade dress protection merely because there are alternative designs available." 28 F.3d at 1276. But in *TrafFix Devices*, the evidence of alternative design – three or four springs instead of two – was before the court, and certainly could have been considered *in the first place*. Nevertheless, the Supreme Court did not find it appropriate, or necessary, to enter it into the calculus.

coupler, the plaintiff did not specify that in his interrogatory response. (Def.Ex. 5, at 9). All he did was cite *Logan Graphic Products, Inc. v. Textus USA, Inc.,* 67 U.S.P.Q. 1470 (N.D.Ill. 2003). (Def.ex. 5, at 9).[6] The defendants weren't particularly happy with this portion of plaintiff's response – an entire opinion to answer a simple, direct question – and I indicated it was a bit too abstract of an answer and instructed the plaintiff to file a more responsive answer. (Def.Ex. 12, at 38-41). Plaintiff's counsel explained his citation was simply to "a case that discusses secondary meaning." (Def.Ex., at 39). In the end, however, the parties decided it would be alright if the plaintiff stood on that answer, and I noted that the consequences would be whatever the consequences would be. (Def.Ex., at 41). Plaintiff never changed his answer.

Now, plaintiff contends that answer stood for an allegation that the trade dress sought to be protected was the overall appearance because the case mentions that factor. (*Plaintiff's Response to Defendants' Motion for Summary Judgment,* at 7 n.3). That is not a particularly effective way to raise the core component of a claim. The case relied on said a number of things. The plaintiff explained that he was relying on it for its discussion of "secondary meaning." Moreover, the plaintiff does not develop an argument regarding overall appearance – he merely cites cases that say overall appearance can constitute protectable trade dress. (*Plaintiff's Response to Defendants' Motion for Summary Judgment,* at 7). It can; but that's no more than an allegation that his trade dress is the coupler's overall appearance. An allegation is not enough to withstand summary judgment. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986); *Borello v. Allison,* 446 F.3d 742, 748 (7th Cir. 2006). There must be admissible *evidence* sufficient to meet plaintiff's heavy burden of demonstrating that his asserted trade dress is not functional. There is none.

_____

[6] The case is reported in Westlaw at 2003 WL 21011746.

13

It is true that, even if every feature of a product is functional, the overall appearance or combination of those features might still be distinctive and qualify as nonfunctional trade dress. But the plaintiff must point to something "arbitrary about the components of its device or the way they are assembled." *TrafFix Devices*, 532 U.S. at 24. Judge Posner had this to say about overall appearance in *Publications Intern.*:

> Although none of the functional features of PIL's cookbooks can be appropriated to serve as a trade dress, it doesn't follow that the ensemble cannot be. Any product, any package, can be decomposed into elements that are not protectable. Every distinctive appearance is built up from elements that are not themselves distinctive . . . . In the case of a consumer product, the elements might all be functional. If the product nevertheless presented a distinctive appearance, that appearance would be eligible for legal protection as trade dress unless it was the only way the product *could* look, consistent with its performing each of the product's functions optimally. But obviously the fact that a competitor's product has the same functional features as the plaintiff's isn't going to make the latter distinctive; if it didn't have the same functional features, it might not be the same product.

164 F.3d at 342. Judge Posner explained that all cookbooks had to have certain features which meant that cookbooks from different publishers would look rather alike. Competing publishers – or coupler manufacturers – "would find it optimal, wholly apart from any desire to confuse consumers about the publisher's identity, to use the very combination of features . . . ." 164 F.3d at 343.

The Ninth Circuit put it a slightly different way in *Leatherman Tool Group, Inc. v. Cooper Industries, Inc.*, 199 F.3d 1009, 1013 (9th Cir. 1999):

> . . . where the whole is nothing other than the assemblage of functional parts, and where even the arrangement and combination of the parts is designed to result in superior performance, it is semantic trickery to say that there is still some sort of separate "overall appearance" which is non-functional. If it is permissible to draw a distinction between such an object and its "general appearance," then virtually nothing is utilitarian, and virtually the only product designs which could be copied

14

faithfully are those which are widely used and therefore in the public domain. Such
a result would be wholly inconsistent with the principles [of trade dress].

199 F.3d at 1013. *See also Antioch Co.*, 347 F.3d at 159 (overall appearance not trade dress where

"features . . . work in sync . . . to provide the user with the advertised benefits.").[7]

All this is to say that pipe couplers have to have certain functional features combined or they

wouldn't be pipe couplers. The coupler is designed to securely and easily join two pipes. That's its

function. It has to be cylindrical, has to have threads on the inside, has to be a size corresponding

to the pipes, has to be the color required by the customer. Moreover, it works best in a certain

thickness, with tapered ends, and with a gripable surface. These "concerns" would be common to

all producers of couplers. *See Publications Intern.*, 164 F.3d at 342-43. The plaintiff has done

nothing to show he has assembled them in an arbitrary or fanciful way – it's unlikely he even could

have.

What the plaintiff seems to really be arguing about is that he was the first to combine all these

features or innovations, and he ought to be rewarded. But that's not trade dress protection. "The

Lanham Act does not exist to reward manufacturers for their innovation in creating a particular

device; that is the purpose of the patent law and its period of exclusivity." *TrafFix Devices*, 532 U.S.

at 34; *see also Publications Intern.*, 164 F.3d at 343 (" . . . trademark and trade dress law do not

protect originality; they protect signifiers of source."). Neither innovation, nor alternative designs,

serves to meet plaintiff's "heavy burden" of establishing nonfunctionality. As such, the defendant

---

[7] The case plaintiff relies upon – and has relied upon – extensively, *Logan Graphic Products*, is
readily distinguishable. There, the plaintiff put on evidence that the features of the product at is were *not*
covered by a patent. 2003 WL 21011746, *3. Because there were no admissions that the features were
functional and no patent covering the features at issue, the court found it appropriate to consider alternate
designs. 2003 WL 21011746, *5.

is entitled to summary judgment on plaintiff's Lanham Act claim.

## C.
### Secondary Meaning

As plaintiff has failed to establish nonfunctionality, there is no need to consider whether he has demonstrated secondary meaning. But on that issue as well, the analysis does not favor him.. The secondary meaning issue in this case, like the functionality issue, is tied up with what occurred in discovery. Through interrogatories, the defendants sought some details about the trade dress claim. (*Def.St.*, ¶ 39; *Pl.Resp.*, ¶ 39). Among other things, they queried about plaintiff's theory on secondary meaning of his couplers:

> 11. Explain in detail the basis for your contention that any feature(s) of your couplers identified . . . have acquired secondary meaning to indicate the source or origin of such couplers with your company, Lozon. In your response:
>
> > A. Describe with specificity all facts that support your contention;
>
> > B. Describe with specificity the legal basis that supports your contention;....

(Def.Ex. 5, at 10). The plaintiff responded:

> A. Plaintiff's distinctive "Lozon" product has been on the market since 1998. Plaintiff has sold millions of "Lozon" couplers in that time, becoming the largest and best-selling coupler manufacturer. B. Plaintiff objects to the portion of this interrogatory as vague and possibly premature in calling for information which will be the subject of expert testimony. Subject to this objection, plaintiff states: see, e.g., *Logan Graphic Products, Inc. v. Textus USA, Inc.,* 67 U.S.P.Q. 1470 (N.D.Ill. 2003). . . .

(Def.ex. 5, at 9). As before, the defendants weren't pleased with the plaintiff citing an entire opinion when asked for a legal basis. (plaintiff's response was essentially repeated for interrogatories 10, 11, and 12). (Def.Ex. 12, at 38-41). As already noted, the plaintiff's counsel explained his citation

was simply to "a case that discusses secondary meaning." (Def.Ex., at 39).

The case does, indeed, discuss secondary meaning, what it is, and how to prove a product has

acquired it:

> A plaintiff's trade dress has acquired secondary meaning when in the minds of the public, the primary significance of a product feature ... is to identify the source of the product rather than the product itself. Secondary meaning can be established by direct consumer testimony, consumer surveys, length and manner of use, amount and manner of advertising, volume of sales, place in the market and proof of intentional copying.

*Logan Graphic Products, Inc. v. Textus USA, Inc.*, 67 U.S.P.Q. 2d 1470, 1473-74, 2003 WL

21011746, *4 (N.D.Ill. 2003). So, the defendants – and the court – are entitled to assume that the

plaintiff will establish secondary meaning in the fashion stated in *Logan Graphic Products* – no

different than any other case, actually – with evidence of consumer testimony, consumer surveys,

length and manner of use, amount and manner of advertising, volume of sales, place in the market

and proof of intentional copying. *See Thomas & Betts Corp. v. Panduit Corp.*, 138 F.3d 277, 291

(7th Cir. 1998).

The plaintiff concedes that he has no consumer testimony or survey evidence to demonstrate

secondary meaning. (*Def.St.*, ¶¶ 40-42; *Pl.Resp.*, ¶¶ 40-42). "While not fatal . . . the absence of that

evidence weighs against [plaintiff]." *Platinum Home Mortg. Corp. v. Platinum Financial Group,*

*Inc.*, 149 F.3d 722, 728 (7th Cir. 1998). Obviously, this is the best evidence of secondary meaning

because it shows what is in the minds of the product's consumers. After all, that's the point: the

plaintiff has to prove the "primary significance" of his trade dress "in the minds of the public, is to

identify the product's source rather than the product itself." *Wal-Mart Stores*, 529 U.S. at 211

(2000). All the other types of evidence – sales, advertising, copying – are circumstantial. *Platinum*

17

*Home Mortg. Corp. v. Platinum Financial Group, Inc.*, 149 F.3d 722, 729 (7th Cir. 1998); *Echo Travel, Inc. v. Travel Associates, Inc.*, 870 F.2d 1264, 1267 (7th Cir. 1989). There is nothing wrong with circumstantial evidence, *see Sylvester v. SOS Children's Villages Illinois, Inc.*, 453 F.3d 900, 903 (7th Cir. 2006), which can even be more certain, satisfying and persuasive than direct evidence. *Michalic v. Cleveland Tankers, Inc.*, 364 U.S. 325, 330 (1960). But, the evidence must show that the trade dress has acquired secondary meaning.

Without direct evidence, plaintiff focuses almost exclusively on evidence of intentional copying. He argues, simply, that the fact "that defendants intentionally copied the Lozon coupler cannot be seriously disputed." (*Plaintiff's Response to Defendants' Motion for Summary Judgment*, at 13). Without further development, however, that argument is far too simple. Unadorned evidence of copying, without more, is hardly probative of secondary meaning. It just raises the question, why was the product copied? "Copying is only evidence of secondary meaning if the defendant's intent in copying is to confuse consumers and pass off his product as the plaintiff's. " *Thomas & Betts Corp. v. Panduit Corp.*, 65 F.3d 654, 663 (7th Cir. 1995). Plaintiff makes no argument regarding intent here, and offers only evidence of copying. (*Plaintiff's Response to Defendants' Motion for Summary Judgment*, at 13, citing Plaintiff's Facts ¶¶ 3, 18, 29, 32, 37). This is an especially weak showing where, as here, the plaintiff is contending that the product *itself* was copied. *Thomas & Betts*, 65 F.3d at 663. "'[T]he copier may very well be exploiting a particularly desirable feature, rather than seeking to confuse consumers as to the source.'" *Id.* (quoting *Duraco Products, Inc. v. Joy Plastic Enterprises, Ltd.,* 40 F.3d 1431, 1453 (3rd Cir. 1994). Then, the topic of discussion is no longer secondary meaning, but drifts over to functionality.

In other words, there is copying inspired by a product that works well – which is okay – and

18

copying that is inspired by a desire to usurp a producer's goodwill – which is not. *Thomas & Betts*,
65 F.3d at 658 ("effective competition and the penumbra of the patent laws require that competitors
be able to slavishly copy the design of a successful product."). The distinction is a delicate one, and
courts have struggled to articulate it. It may have been explained no better than it was seventy years
ago by the Seventh Circuit in *Sinko v. Snow-Craggs Corp.,* 105 F.2d 450, 453 (7th Cir.1939). The
product there was the "suicide knob" or "Brodie knob," a knob that attached to the steering wheel
of a vehicle and allowed the driver to spin the wheel with one hand. The court summarized the
issue:

> . . . [plaintff] created a desire on the part of the public for one of two things, either
> for knobs made by [plaintiff], above all other knob makers, or for knobs made in a
> particular manner regardless of who made them. If it is the first situation, the law of
> unfair competition gives [plaintiff] the right to monopolize or to exclude other
> makers from copying the product. If it is the latter situation, [plaintiff] receives no
> such right to monopolize, even though he might have been the first one to make the
> article in the particularly desirable manner.

105 F.2d at 453. The same distinction is dispositive here. Defendants had every right to copy the
couplers exactly, but not if they did so to exploit the consumer's desire for couplers from the
plaintiff, as opposed to couplers that had the same features. "The defendant has the right to get the
benefit of that (public) desire even if created by the plaintiff. The only thing it has not the right to
steal is the good will attaching to the plaintiff's personality, the benefit of the public's desire to have
goods made by the plaintiff." *Flagg Mfg. Co. v. Holway*, 178 Mass. 83, 91, 59 N.E. 667
(1901)(Holmes, C.J.). Whether that's what the defendant did here is a question left unanswered by
plaintiff's evidence of copying.

From copying, plaintiff falls back to length of use, sales, and advertising. His arguments

regarding length of use and sales, however, are skeletal and unsupported by any pertinent authority. Moreover, he provides no competent evidence to support his assertions. Plaintiff claims that his coupler has been on the market since 1998 and that his company is the largest manufacturer of couplers in the world. (*Plaintiff's Response to Defendants' Motion for Summary Judgment*, at 14-15; *Plaintiff's Rule 56.1(b) Statement of Additional Facts*, ¶ 1). But in support of that conclusory assertion, he cites only a product specification sheet from his company; basically, an advertisement. In essence, Mr. Minemyer's contention is that he can prove he began selling couplers in 1998 and that he is the largest manufacturer of couplers because his company's specifications sheet says so.[8] This sort of evidentiary bootstrapping is insufficient to create admissible evidence and disputed issues of material fact. *Compare A. B. Leach & Co. v. Peirson*, 275 U.S. 120, 128 (1927)(Holmes, J.)("A man cannot make evidence for himself by writing a letter containing the statements that he wishes to prove."). Moreover, offered to prove the truth of the matter asserted therein, the specification sheet is hearsay and inadmissible. *See Cody v. Harris*, 409 F.3d 853, 860 (7th Cir. 2005)(newspaper article hearsay); *Chicago Firefighters Local 2 v. City of Chicago*, 249 F.3d 649, 654 (7th Cir. 2001)(same); *United States v. Parker*, 991 F.2d 1493, 1500 (9th Cir. 1993)(advertisements hearsay).

This type of evidence, unlike consumer evidence, does not prove secondary meaning on its own. Length of use – exclusive use – is a relevant factor because "[a] mark acquires secondary meaning when it has been used so long and so exclusively by one company in association with its products or services in that particular industry that the 'word, term, name, symbol, or device' has

---

[8] Mr. Minemyer's "proof" is analytically indistinguishable from the fisherman who boasts of catching a 30 foot bass. When faced with looks of incredulity, he says, "here's the tape measure I used to measure the beast."

come to mean that those products or services are the company's trademark." *Platinum Home Mortg..*, 149 F.3d at 728; *see also AM General Corp.*, 311 F.3d at 824. Plaintiff's couplers were on the market eight years before defendants'. (*Plaintiff's Rule 56.1(b) Statement of Additional Facts*, ¶¶ 31-32). Relatively speaking, that's not a terribly long period. *See AM General Corp.*, 311 F.3d at 824 (50 years); *Thomas & Betts.* 138 F.3d at 293 (7th Cir. 1998)(thirty years); *Union Carbide Corp. v. Ever-Ready Inc.*, 531 F.2d 366, 380 (7th Cir. 1976)(over fifty years); *Gimix, Inc. v. JS & A Group, Inc.*, 699 F.2d 901, 907 (7th Cir. 1983)(five years too brief). Although more than five years' use of trade dress "has some bearing on the issue of secondary meaning," *Thomas & Betts*, 138 F.3d at 296; 15 U.S.C. § 1052(f) (trademark commissioner may accept five years' exclusive and continuous use of a mark as prima facie evidence of secondary meaning), eight years of exclusive use is but a single factor, and there are no cases that find secondary meaning deriving entirely from length of use. In *Thomas & Betts*, for example – a case plaintiff relies upon extensively – the plaintiff presented *direct* evidence in the form of consumer affidavits and surveys[9] in addition to thirty years' length of use.

That leaves advertising, also circumstantial evidence, and also evidence that does not necessarily indicate that consumers associate a mark with a particular source. *Platinum Home Mortg.*, 149 F.3d at 729. The salient aspects of advertising, for secondary meaning purposes, are the duration and extent of the campaign and the nature of the advertising itself. *AM General Corp.*, 311 F.3d at 804; *Packman v. Chicago Tribune Co.*, 267 F.3d 628, 641 (7th Cir. 2001). "Advertising which encourages consumers to identify the claimed trade dress with the particular producer . . . is

---

[9] The direct evidence in *Thomas & Betts* actually came from dealers and distributors, which were the relevant buyer class.

some evidence of secondary meaning. . . . If a good deal of such advertising is done, the presumption is that at least some of it will take and some consumers will make the suggested connection." But plaintiff makes absolutely no mention of the duration or extent of his advertising (*Plaintiff's Response to Defendants' Motion for Summary Judgment*, at 14-15), aside from the fact that it consists of magazine ads, sales brochures, and an internet page. (*Id.*; *Plaintiff's Statement of Additional Facts*, ¶ 38). There's no telling whether "a good deal of . . . advertising" was done, so the presumption cannot be made. And, in the end, it really doesn't matter "what efforts or money the [plaintiff] expended in order to persuade the public . . . . So far as it did not succeed in actually converting the world to its gospel it can have no relief." *DuPont Cellophane Co. v. Waxed Prods. Co.,* 85 F.2d 75, 81 (2nd Cir.), *cert. denied,* 299 U.S. 601 (1936). There is no evidence at all that plaintiff succeeded in spreading his gospel.

As to the nature of plaintiff's advertising, he describes it like this:

> [Plaintiff's] sales brochures and internet pages *tout the patented features of the product* - the "ModiThread" design ("provides great pull strength during installation"), the "Seal-Land" ("provides a smooth interference land are for an improved seal"), and the internal "Posi-Stop" ("provides a back stop which ensures equal engagement of the duct and coupler on both sides of the connection"). JTM000462. [Plaintiff's] magazine ads depict the products under the Lozon name. JTM05923, JTM006021.

(*Plaintiff's Statement of Additional Facts*, ¶ 38)(Emphasis supplied).

Obviously, even from plaintiff's own description, the sales brochures and internet pages do not serve to encourage consumers to identify the claimed trade dress with the producer. *Thomas & Betts*, 138 F.3d at 292. Instead, they clearly tout the functional advantages of the coupler, and nothing more. *Id.* The magazine advertisement lists several Lozon products and depicts them in

22

small pictures: couplers, plugs, adapters, spacers presses, manholes, etc. The photos are small, but there appear to be four *different* looking couplers. There is no "look" running through all four – or through all of the plaintiff's products depicted – that would lead a consumer to associate a feature or overall appearance with the products' source. Moreover, the features at issue in this case are hardly identifiable in the photos. As such, the advertisements differ significantly from those in *Thomas & Betts*, where the critical feature was "prominently" depicted in the advertisements, leading one to possibly identify it with the manufacturer's name. *See id.*

Essentially, plaintiff is asking the court to assume what he has the burden of proving: that the very design of his coupler serves primarily to identify its source. *See Spraying Systems Co. v. Delavan, Inc.*, 975 F.2d 387, 393 (7th Cir. 1992). What plaintiff has presented is no consumer evidence, no evidence of the duration or extent of his advertising, a sales brochures and an internet page that focus on his products' functional features, and one magazine advertisement that fails to specifically emphasize his "mark." That's insufficient to prove secondary meaning. *Platinum Home Mortg. Corp. v. Platinum Financial Group, Inc.*, 149 F.3d 722, 729 (7th Cir. 1998)("Evidence of advertising and sales is entirely circumstantial, and that evidence does not necessarily indicate that consumers associate a mark with a particular source, particularly when the advertisements and promotions do not specifically emphasize the mark. . . . Accordingly, courts have found that this type of evidence may be insufficient to establish . . . secondary meaning."). So, even if plaintiff had met his "heavy burden" of establishing nonfunctionality, defendants would nevertheless be entitled to summary judgment because the plaintiff has not proven that the primary significance of his product features is to identify the source of the product rather than the product itself. *Wal-Mart Stores*, 529 U.S. at 211.

23

**D.**

**Likelihood Of Confusion**

Because the plaintiff failed to establish the first two elements of his claim, there is no need to address the final element, likelihood of confusion. But, briefly, he would not be successful with regard to this element either. Likelihood of confusion is measured by: (a) the similarity of the trade dresses; (b) the area and manner of concurrent use, including the similarity of the products on which the trade dresses are being used; (c) the degree of care likely to be used by consumers; (d) the strength of plaintiff's trade dress; (e) evidence, if any, of actual confusion; and (f) any intent of defendant to pass off its product as that of plaintiff. *AutoZone, Inc. v. Strick*, 543 F.3d 923, 929 (7th Cir. 2008); *Sullivan v. CBS Corp.*, 385 F.3d 772, 776 (7th Cir.2004); *AM General Corp.*, 311 F.3d at 824-25; *Thomas & Betts Corp.*, 138 F.3d at 296. No single factor is dispositive, and different factors will weigh more heavily from case to case depending on the particular facts and circumstances involved. *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 898 (7th Cir. 2001).

As a consequence, the "'weight and totality of the most important factors in each case will ultimately be determinative of the likelihood of confusion, not whether the majority of the factors tilt the scale in favor of one side or the other.'" *Id.* Even though no one factor is decisive, courts have found that the similarity of the marks, the intent of the defendant, and evidence of actual confusion are the most important factors. *Ty, Inc.*, 237 F.3d at 898; *Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d 456, 462 (7th Cir.2000); *G. Heileman Brewing Co., Inc. v. Anheuser-Busch, Inc.*, 873 F.2d 985, 999 (7th Cir.1989).

There is no doubt that the parties' products are similar. They are perhaps nearly identical, with a significant exception. The parties' respective company names are embossed on their couplers.

24

Defendant even provides its phone number on its couplers. This labeling provides a strong indication that there is no likelihood of confusion. *Packman v. Chicago Tribune Co.*, 267 F.3d 628, 645 (7th Cir. 2001); *Syndicate Sales, Inc. v. Hampshire Paper Corp.*, 192 F.3d 633, 637 (7th Cir. 1999). As plaintiff himself testified at his deposition, one can tell whose coupler it is because of the label. (Defendant's Exhibit 6, Minemyer Dep., at 247). True, the names do not stand out when viewed at a distance, but that's not how they are viewed in the relevant marketplace. *See AM General Corp.*, 311 F.3d at 825 (". . . courts evaluate similarity in light of what happens in the marketplace, rather than just by making a side-by-side comparison . . . .").

There is no dispute that the consumers in the relevant marketplace do not merely glance at the products in a store before purchase. Different producers bid their couplers to the consumers – giant communications companies like AT&T and Verizon – based on the companies' specifications. The companies order the brand that best meets their qualifications. They know from whom they are ordering. Thus, the similarity of the products and the fact that labels or company identifications might not readily stand out in a different setting are not significant. *See Au-Tomotive Gold, Inc.*, 457 F.3d at 1076 ("Confusion is less likely where buyers exercise care and precision in their purchases, such as for expensive *or sophisticated items.* ") (Emphasis supplied). The exceedingly sophisticated corporations that purchase these products "are in a better position than the typical consumer either to order the correct goods, or to return the incorrect goods and receive the intended goods." *Syndicate Sales*, 192 F.3d at 638. The degree of care exercised in purchasing these products is high – these businesses "are particularly sophisticated or deliberative." *AutoZone*, 543 F.3d at 933. And, as already determined, the plaintiff's trade dress is not strong – another factor running against likelihood of confusion.

25

As for evidence of actual confusion, the plaintiff relies entirely on documents he received from Verizon pursuant to a *subpoena duces tecum.* He claims that certain pages of these documents demonstrate that when Verizon ordered couplers from defendant, Dura-Line, it thought it was getting plaintiff's couplers. This is the only evidence plaintiffs offer on likelihood of confusion. (*Plaintiff's Response to Defendants' Motion for Summary Judgment*, at 17). They are grouped in an exhibit along with his *subpoena duces tecum* to Verizon for:

> all documents concerning plastic reverse-threaded couplers supplied under agreement with . . . [defendant] Dura-Line Corporation, including the agreement and . . . communications and documents sufficient to identify all products bid . . . . .

(Pl.Exs., Verizon pg. 6). The documents are presented without any testimony or affidavit. Production by Verizon pursuant to the subpoena is sufficient to authenticate the documents as having been found in Verizon's files. *See* Rule 901, Federal Rules of Evidence. But satisfying Rule 901 does not automatically result in admissibility. There is the hearsay bar of Rule 802, Federal Rules of Evidence, that must be overcome as well. And lastly, even if the hearsay rule is inapplicable, the documents, themselves, must be sufficient to create a disputed issue of material fact since the plaintiff offers no testimony relating to them.

It is impossible to know who the author/declarant of the documents was. They merely recite that one of the advantages of the defendant's bid is that it "Bid Lozon [Minemyer] products" or that Lozon wouldn't be bidding because it "bid through [defendant]." (Pl.Exs., Verizon pgs. 13, 16). If the statements are offered to prove that the bidder was bidding Mr. Minemyer's products and that Minemyer was acting through the corporate bidder, the statements are obviously hearsay, *see* Rule 801(c), Federal Rules of Evidence, and thus, inadmissible. *See Carlisle v. Deere & Co.*, 576 F.3d

649, 655 (7th Cir. 2009); *Matthews v. Wisconsin Energy Corp. Inc.*, 534 F.3d 547, 557 (7th Cir. 2008).

If, however, the significance of the statement lies solely in the fact that it was made – and assuming it was made by a Verizon employee, for if it were not, it would have no relevance – the hearsay rule is not a bar to admissibility so long as the non-hearsay purpose for which the evidence is offered is relevant under Rule 401, Federal Rules of Evidence. *See Williamson v. United States*, 512 U.S. 594, 598 (1994); *Tennessee v. Street*, 471 U.S. 409 (1985); *United States v. Montana*, 199 F.3d 947, 950 (7th Cir.1999)(Posner, J.); *United States v. Blackwell*, 459 F.3d 739, 755 (6th Cir. 2006); Advisory Committee notes to Rule 801(c). Here, the relevance of the evidence when offered for its non-hearsay purpose is that it has some tendency to show that at least the declarant may have been confused as to the source of the couplers bid by the defendants.[10]

The problems with the evidence even when viewed from this vantage point are insuperable. First the evidence is insufficient to show that even the author of the document (ie. the declarant) was confused about the source because of the products' trade dress. It could just as easily show possible confusion about what the bidders were going to use as a basis for the bid based on information

---

[10] Statements expressing the declarant's then existing state of mind fall within the hearsay exception in Rule 803(3). *See Apanovitch v. Houk*, 466 F.3d 460, 486 (6th Cir. 2006)(statements expressing fear of defendant). Wigmore distinguished between direct expressions of mental state or emotion and statements that circumstantially evidence a particular state of mind. The example, or some variation, often given to illustrate the distinction is: X is too mean to live and I hate (or fear) X. Unless offered to prove that X in fact is a mean person, the former assertion is non-hearsay because it is used to demonstrate circumstantially a state of mind hostile to X. By contrast, the latter statement is a direct expression of a then-existing mental state. *See Smith v. Duncan*, 411 F.3d 340, 346 n.4 (2nd Cir. 2005); *United States v. Brown*, 490 F.2d 758, 762-763 (D.C. Cir. 1973); VI J. Wigmore, Evidence, § 1715. Often the distinction is blurry, and cases treat the two kinds of evidence interchangeably and admissible under Rule 803(3). *See e.g., United States v. Hartmann*, 958 F.2d 774 (7th Cir. 1992). The method of treatment, however, does not affect admissibility, only its analytical basis.

received from some third party rather than based upon some confusion generated by the products' physical similarities. Basic summary judgment principles do not allow the party with the burden of proof to show the existence of a disputed issue of material fact merely by drawing "[i]nferences that are supported by only speculation or conjecture." *Fischer,* 519 F.3d at 401. The nonmoving party "must do more than raise some metaphysical doubt as to the material facts; he must come forward with specific facts showing that there is a genuine issue for trial." *Keri,* 458 F.3d at 628.

In fact, the evidence shows that any "confusion" in terms of what was going to be bid may well have stemmed not from the product's trade dress, but from Mr. Minemyer, himself. On August 11, 2006, Mark Maynard of Lozon emailed Kathy O'Neill of Verizon informing her that Lozon would not be submitting a quote "directly" to Verizon because it had an exclusive arrangement with Dura-Line through which it had been supplying Verizon with couplers for the past two years. (*See Pl.'s Rule 56.1(b) Response to Defendant's Statement of Material Facts*, Ex., Verizon Documents at Verizon p. 8). To conclude that the Verizon documents reflect confusion rather than merely reflecting a faithful rendition of what was being told by Lozon to Verizon would require the very speculation and conjecture that is forbidden not only in a summary judgment context but in all contexts.

Second, even if the evidence reflected some confusion on the part of the declarant, it would not suffice to show anything more than that the author of the document may have experienced some confusion. But the confusion of a single person is manifestly insufficient to demonstrate confusion by Verizon or the kind of broad confusion that must be shown under the Lanham Act. And so, while the evidence may be admissible under Rule 401 and 801(c), it is insufficient to raise a disputed issue of material fact on the issue for which it is offered.

28

So viewed, one need not deal with the question of whether the documents fall within the hearsay exception of 803(6), which provides that:

> [a] memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness, or by certification that complies with Rule 902(11) [or] Rule 902(12) . . . .

Rule 803(6) is not an extension of Justice Stewart's famous quip, "I know it when I see it." It is essential that the proponent of the evidence "lay a proper foundation establishing that the documents produced were records kept in the course of regularly-conducted activity and that 'it was the regular practice of that business to make [the document] as shown by the testimony of the custodian or other qualified witness.'" *United States v. Christ*, 513 F.3d 762, 769-70 (7th Cir. 2008). *See also, United States v. Gwathney*, 465 F.3d 1133, 1141 (10th Cir. 2006); *United States v. Pellulo*, 964 F.2d 193 (3d Cir. 1992)(checks and other bank records); *United States v. Gwathney*, 465 F.3d 1133, 1141 (10th Cir. 2006); 4 Weinstein's Evidence, §803.08[8][a]. Mr. Minemyer has made no attempt to lay the appropriate foundation. Indeed, nothing is known about the documents other than that they came from Verizon's files. Constituting the only evidence of likelihood of confusion (*Plaintiff's Response to Defendants' Motion for Summary Judgment*, at 17) – the documents are not enough to create a material issue of disputed fact, and plaintiff has thus failed to meet his burden of establishing likelihood of confusion.[11]

---

[11] In reply to the Verizon documents, defendants submitted the affidavit of Clifford Ginn, who was responsible for approving the technical aspects of coupler bids at Verizon. (*Defendants" Exhibits*, Ex. 19, ¶ 2). He said he was familiar with the bid in question, that defendants provided samples of their couplers

(continued...)

## D.
## Plaintiff's Coterminous State Law Claims

The defendants argue that, because the Lanham Act claim fails, so, too, must his state law claims: Count V, brought under the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFDBPA"); and Count VI, brought under the Illinois Uniform Deceptive Trade Practices Act ("IUDTPA"). The plaintiff agrees that trade dress claims brought under federal or state unfair competition law "are subject to the same analysis and will rise and fall together . . . ." *See Gimix*, 699 F.2d at 908 (same legal principles apply to Lanham Act and state unfair competition law claims); *MJ & Partners Restaurant Ltd. Partnership v. Zadikoff*, 10 F.Supp.2d 922, 929 (N.D.Ill. 1998)(same); *Thompson v. Spring-Green Lawn Care Corp.*, 126 Ill.App.3d 99, 466 N.E.2d 1004, 1010 (1st Dist. 1984)(same). But plaintiff argues in his response to the defendants' motion for summary judgment that his state law claims go beyond trade dress and are, therefore, not coterminous with his Lanham Act claim.

Counts V and VI of the Second Amended Complaint include no specific allegations; they simply assert that Count V relies on "[t]he actions complained of Count VI to VIII above [sic] . . . ." and that Count VI relies entirely on "[t]he actions complained of Counts IV and V above . . . ." (*Second Amended Complaint*, ¶¶ 45; 47). Counts VII and VIII were dismissed by stipulation of the parties on May 1, 2009 (Dkt. #165), so the plaintiff's state law claims, rather confusingly, depend entirely on Counts V and VI or, in other words, on themselves. And again, neither count alleges

---

[11](...continued)

– as opposed to plaintiff's couplers, which they had previously supplied – to indicate what they were bidding, and that there was no confusion at Verizon about the source of the product. (Ex. 19, ¶¶ 3-7). This is competent, admissible evidence that there was no actual confusion. It stands unrebutted.

anything other that the conclusory assertion that the defendants violated the ICFDBPA and the IUDTPA.

The two counts do "restate[] and reallege[]" the allegations underlying plaintiff's patent infringement and Lanham Act claims. (*Second Amended Complaint*, ¶¶ 44; 46). Those allegations make up plaintiff's patent infringement and trade dress claims. Illinois unfair competition laws do not cover claims of patent infringement – that's what federal patent law is for. *Chapman Performance Products, Inc. v. Producers Sales, Inc.*, 16 Ill.App.3d 459, 461, 306 N.E.2d 615, 616-17 (1st Dist. 1973). And, as already noted, plaintiff concedes that his state and federal trade dress claims are coterminous.

He makes no reference to it in his brief, but at oral argument, the plaintiff insinuated that his Lanham Act claim was actually two separate claims: one for trade dress infringement and one for false advertising. Not so. The Lanham Act provides for two distinct bases of liability: false designation of origin or source, and false description or representation as to the quality of goods under 15 U.S.C. § 1125(a)(1)(A), or "false advertising" under 15 U.S.C. § 1125(a)(1)(B). *Stanfield v. Osborne Industries, Inc.*, 52 F.3d 867, 873 (10th Cir. 1995); *Resource Developers, Inc. v. Statue of Liberty-Ellis Island Foundation, Inc.*, 926 F.2d 134, 139 (2nd Cir. 1991); *Lamothe v. Atlantic Recording Corp.*, 847 F.2d 1403, 1406 (9th Cir. 1988); *see also Gimix.*, 699 F.2d at 908 (to extent "false advertising" clam is based on a "false designation of origin," it must fail if the alleged trademark is invalid). Plaintiff hasn't alleged a false advertising claim. He styles his Lanham Act claim as one for "palming and passing off" – his trade dress claim. (*Second Amended Complaint*, Count IV). He clearly alleges that "[t]he actions of Defendants . . . creat[ed] confusion as to the origin of their couplers . . . ." Again, that's a trade dress claim under 15 U.S.C. § 1125(a)(1)(A). In

31

fact, the only mention of any advertising, false or otherwise, in the complaint is his own advertising. (*Second Amended Complaint*, ¶ 31).

Plaintiff's response brief makes some further allegations it claims are supported by the statement of additional facts. (*Plaintiff's Response to Defendants' Motion for Summary Judgment*, at 2). But causes of action or allegations cannot be added in this way. *Griffin v. Potter*, 356 F.3d 824, 830 (7th Cir. 2004); *Speer v. Rand McNally & Co.*, 123 F.3d 658, 665 (7th Cir. 1997). As such, Counts V and VI of the Second Amended Complaint are coterminous with his trade dress claim. Because that claim fails, so do Counts V and VI.

## CONCLUSION

The defendants' motion for summary judgment on plaintiff's Lanham Act and state law claims [#174] is GRANTED.

ENTERED: _____
UNITED STATES MAGISTRATE JUDGE

DATE: 10/27/09

32