# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| JOHN T. ("TOM") MINEMYER, | ) |
| | ) |
| **Plaintiff,** | ) |
| | )    **No. 07 C 1763** |
| **v.** | ) |
| | )    **Magistrate Judge Cole** |
| R-BOC REPRESENTATIVES, INC., et al. | ) |
| | ) |
| **Defendants.** | ) |

### SUPPLEMENTAL MEMORANDUM OPINION

### INTRODUCTION

On February 6, 2012, I issued a memorandum opinion discussing the question of the admissibility of plaintiff's Exhibit 40 under Rules 901 and 803 (6), Fed. R. Evid. *See Minemyer v. R-Boc Representatives, Inc.*, 2012 WL 379904, *4 (N.D.Ill. 2012). Exhibit 40 is a 16-page document in power point form that was produced by Verizon during discovery pursuant to subpoena. It purports to be a report generated by Verizon in connection with its purchase in October 2006 of underground couplers, pursuant to a bid by defendant, Dura-Line Corporation. It is the plaintiff's theory that Dura-Line bid the plaintiff's Lozon coupler, never intending to use it, but rather to use its own B&C coupler, which did not then exist. The plaintiff contends that he was unaware that the corporate defendants had not bid his product and that they had taken efforts previously to assure that he did not bid directly with Verizon.

The purpose of the claimed deception was to enable Dura-Line and R-Boc to use the B&C coupler, which they had begun to manufacture and which, the plaintiff contends, infringed his '726 patent. At the time of the bid in August 2006, the B&C coupler was not even in existence. Later, after the award of the bid in late October 2006, the allegedly infringing B&C coupler was to be

provided when Dura-Line had sufficient inventory. (*See generally* Plaintiff's Exs. 12,13,17, 18,19, 27, 29, 36, 41, 44, 45, 46, 47, 50). Plaintiff's Exhibit 40, the Verizon Report, is entitled "Innerduct Couplers/Caps, RFP No. R0603358, Contract - Recommendations" and contains an entry on page 8 (and another on page 5) that arguably supports the theory.[1]

The document briefly describes the product involved (innerduct couplers), the product history, the "incumbent suppliers" (one of which is defendant, Dura-Line Corporation), adverts to the RFP issued to 12 suppliers, and, in a few brief single-line sentences, summarizes the perceived "advantages" and "disadvantages" of each bidder and the Cross Functional Team's recommendations, by bidder. The report sets forth in chart form a "savings analysis," and in bullet-point, single-line statements which gives the rationale for supplier selection, and the "next steps" to be taken in light of the Team's recommendations for the vendors' bids that had been accepted. On the page devoted to Dura-Line, there appears the word "Advantages," followed by "Bid Lozon products." There is another terse mention on page 5 that Lozon products had been bid.

The defendants' 2009 motion *in limine* objected to the introduction of the document on two grounds: that it was not properly authenticated under Rule 901and that it was inadmissible hearsay. Rule 802, Federal Rules of Evidence. The February 6 opinion concluded that it was beyond debate that the report was properly authenticated. *Minemyer*, 2012 WL 379904, 6-7.

The opinion noted that despite the plaintiff's expert's clear reliance in his July 16, 2009 expert report (at 35-36) on Exhibit 40's reference to Lozon products having been bid, the defendants never filed a *Daubert* motion challenging that aspect of the report, or seeking to bar his testimony insofar as it relied on those statements. Instead, the defendants' expert's September 14, 2009 report

---

[1] RFP means Request for Proposal. The acronym is used interchangeably with requests for quotes [RFQ] or requests for bids [RFB]. It is an invitation by Verizon to outside suppliers to bid on a particular job.

simply noted that "much of Mr. Degan's rational [sic] regarding acceptability [to Verizon of the Lozon coupler] comes from a document produced by Verizon [Exhibit 40], but of unsubstantiated authenticity. The document is undated and its author unknown." (Report at 20).

The defendants' December 2011 motion's only mention of the issue came as an afterthought in the last eight words of the last sentence of the "CONCLUSION" section of the motion and simply asked that the expert not be allowed to base his opinion in any way on the Verizon report. Pursuant to the basic principle, adhered to throughout the federal system – including the Federal Circuit, *Radar Industries, Inc. v. Cleveland Die & Mfg. Co.,* 424 Fed.Appx. 931, 936, 2011 WL 1150534, 5 (Fed Cir.2011) – that perfunctory, skeletal, and unsupported motions are waived, the opinion concluded that the point had been waived by the defendants. *Minemyer,* 2012 WL 379904, 6-7. This is not a principle with which the defendants were unfamiliar, having run afoul of it a few months earlier. *See Minemyer*, 2011 WL 1099265, 3.

In addition to the cases cited in the February 6 opinion on the waiver question, *see Beamon v. Marshall & Ilsley Trust Co.*, 411 F.3d 854, 862 (7th Cir.2005)(single sentence argument insufficient); *Perry v. Sullivan,* 207 F.3d at 383 (7th Cir.2000)("Even if this argument made sense, Perry cited no authority for this proposition and devoted less than one sentence in the brief to it. Therefore, it is deemed waived."); *United States v. Cusimano,* 148 F.3d 824, 828 n. 2 (7th Cir. 1998)(same); *Sternberg v. Debuys*, 1992 U.S.App. LEXIS 14606 (9th Cir. 1992)(one sentence was insufficient to raise issue).

Still, the question of the *independent* admissibility of Exhibit 40 under the hearsay rule was not resolved by the fact that the plaintiff's expert would be permitted to rely on Exhibit 40, even though the document itself may not have been admissible. *See* Rule 703, Federal Rules of

Evidence.[2]  While the February 6, 2012 opinion continued to exclude Exhibit 40, further reflection and evidence admitted at trial over the past few days has warranted a re-examination of that evidentiary decision.

It cannot be too strongly stressed that nothing in the following discussion is based on any factual finding or credibility determination by the court.  Those are tasks exclusively for the jury.  Rather, the sole purpose is to explore the evidence that was admitted at trial as it bears upon the admissibility of plaintiff's Exhibit 40 and the limitations, if any, that ought to be placed on its use by the jury.  The  significance and import of the evidence of necessity could not have been fully assessed except in the informing context of a trial.

**A**.

The February 6 opinion held that if the Verizon report was offered to prove the truth of the entry on page 5 that Lozon products were bid and the entry on page 8, which deals with Dura-Line and has the entry, "Advantages" "Bid Lozon products" it was hearsay, and absent a showing that the requirements of a  hearsay exception, such as Rule 803(6) were satisfied.  However, if the entries were offered for some relevant, nonhearsay purpose, such as to show Verizon's *perception* of the merits of the Lozon coupler, the hearsay rule would not bar to its admissibility.  *See* the discussion in *Minemyer,* 2012 WL 379904, 4-5 and earlier in 678 F. Supp.2d 691, 709 (N.D.Ill. 2009).  I

---

[2] Admitting Exhibit 40, either as nonhearsay or under the exception to the hearsay rule in Rule 803(3), *see infra* at 10, presents a different question than whether it can be relied on by the plaintiff's damages expert pursuant to Rule 703. That rule provides that an expert may base an opinion or inference upon evidence that itself may not be admissible if it is the type reasonably relied on by experts in the particular field in forming opinions or inferences upon the subject.  However, inadmissible facts or data shall not be disclosed to the jury by the proponent of the opinion unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect. That rule plainly does not govern Exhibit 40 if: it is relevant under Rule 401; does not violate any other rule of evidence, such as the hearsay rule; and is not excludable under Rule 403.

adhered to the ruling excluding the Verizon report for the reasons expressed more than two years ago in the opinion granting summary judgment to the defendants on the plaintiff's trade dress claim. *Minemyer,* 678 F.Supp.2d at 710– 711.

There, it was noted that the defendants had submitted the affidavit of Clifford Ginn, who was responsible for approving the technical aspects of coupler bids at Verizon. (*Defendants' summary judgment motion,* Ex. 19, ¶ 2). Mr. Ginn's affidavit said he was familiar with the bid, that defendants provided samples of their couplers – as opposed to plaintiff's couplers, which they had previously supplied – to indicate what they were bidding, and that there was no confusion at Verizon about the source of the product. (Ex. 19, ¶¶ 3-7). His affidavit was never challenged and thus stood unrebutted, as the summary judgment opinion pointed out.

The evidence at trial added a new dimension to the story. The defendants were bidding the B&C coupler to Verizon before it existed and made numerous representations regarding the coupler they were bidding that the jury could reasonably find misleading, if not false. (*See* Plaintiff's Exs. 12, 26, 27, 29, 36, 45, 46, 47). For example, Dura-Line represented to Verizon, in answers to precise questions asked by Verizon regarding the coupler that was bid, that it had used its own couplers in the field for several years with great success. (Plaintiff's Ex. 36 at 8). That statement was, the plaintiff argued, untrue since the B&C coupler did not exist. The picture of the coupler included with Dura-Line's submission was that of the Lozon coupler. (Plaintiff's Ex. 47). In answer to another question, Mr. Grimsley said that Dura-Line represented that its coupler offers pull a out strength that was twice the value of the standardized requirement. (Plaintiff's Ex. 36 at p.10). Dura-Line's representation, the jury could conclude, was not true since the B&C coupler did not exist at the time. By contrast, in Dura-Line's submissions to AT&T, there was express mention of the B&C

coupler. (*See also* Answers to Questions by Dura-Line in Defendant's Ex. 101).

The jury learned that at Mr. Grimsley's deposition, he testified in elaborate detail how he was certain that samples of the B&C coupler were submitted to Verizon on August 28, 2006, in response to Verizon's demand for samples for field testing. (Plaintiff's Ex. 41). He said that he conducted an extensive inspection of the couplers and could say with certainty that they were B&C couplers. On the witness stand he conceded that that could not have happened because the B&C couplers did not exist.

E-mails between defendant, Mr. Lundeen, and defendant, Mr. Grimsley, showed that they were aware early on that Verizon was going to issue an RFP. Plaintiff's exhibit 12 revealed that Mr. Grimsley and Mr. Lundeen planned to talk to "Carl" (Ginn), who was the Verizon employee who would be drafting the specification for the RFP, and expressed the view that they might be able to get him to "eliminate the other people on technical specs. Food for thought." Shortly thereafter in February 2006, even before the RFP went out, Mr. Grimsley again e-mailed Mr. Lundeen and told him that Mr. Ginn attended a meeting at which he said that the anticipated RFP was likely going to require "dielectric couplers "like the Lozon."

Ginn asked Grimsley to send him information on the Lozon couplers "so he can write the spec favorably towards" Lozon. (Plaintiff's Ex. 13.). The e-mails are susceptible of being read to show that Mr. Lundeen, acting through a business affiliate, Carl Bauz, had prevailed on Mr. Ginn to write the specifications for Verizon's RFP with the Lozon coupler in mind and in favor of it. (Plaintiff's Exs. 12, 13). Indeed, on the witness stand when questioned by plaintiff's counsel about this, Mr. Lundeen, referring to Bauz and the meeting where Mr. Ginn made his announcement and agreed with counsel's statement that Bauz certainly earned his money that day." Mr. Grimsley and

Mr. Ginn were to have dinner that night.[3]

Verizon documents were introduced without objection by the defendants that the jury could find affirmatively stated that Dura-Line had in fact bid Lozon products. These exhibits came in the form of e-mail's between Verizon and the plaintiff's president of sales, Mark Maynard, e-mails between Mr. Lundeen and Mr. Grimsley, and evidence obtained from the defendant's books and records. Plaintiff's Exhibits 63 and 64 are e-mails between Mr. Maynard and Kathy O'Neil, a senior Verizon employee, with whom Mr. Grimsley testified he spoke constantly. Ms. O'Neil is part of Verizon's Strategic Sourcing and is also the Verizon representative who signed the contract with Dura-Line in October 2006 and in earlier years, and was the person who informed Mr. Grimsley in October that Dura-Line was the successful bidder. (Pl. Ex. 45). She was, most importantly, a member of the Cross Functional Team involved in the bid and contract involved in this case.

The evidence, the plaintiff will argue, reveals that by early 2005, Mr. Grimsley and Mr. Lundeen had decided to copy the plaintiff's one-piece coupler and sell it to Verizon and others and to prevent Plaintiff from bidding the upcoming Verizon contract directly, as they knew he would be invited by Verizon to do and as the evidence shows he ultimately was. They did so, the plaintiff will argue, knowing that Verizon liked the Lozon product so much that the specifications for the 2006 RFP were to be prepared with the Lozon coupler as the basis for the specification. (Plaintiff's ex. 12, 13). Or so they hoped. The defendants' position is whatever the original expectations were about the specifications, they were never drawn to favor Lozon.

Months passed with plaintiff having no word on the bid from Dura-Line. Finally, on October

---

[3] On examination by his own counsel, Mr. Grimsley testified that the specifications were not drawn to favor the Lozon coupler and reviewed documents from which the defendants will argue that despite the statements contained in e-mails between Mr. Lundeen and Mr. Grimsley their expectations regarding the drafting of the specifications were not realized. These matters are for the jury.

25, 2006, Mr. Maynard, believing that Lozon couplers had been bid by Dura-Line, sent an e-mail to Ms. O'Neil inquiring about the contract and noting that it had not bid the contract directly, but had preferred to remain with Dura-Line, as it had in previous years.[4] Ms. O'Neil responded that as the bid had been awarded by the Cross Functional Team, she was not at liberty to provide any information. "*Since Lozon Solutions bid through Dura-Line,*" she suggested that he contact Mr. Grimsley of Dura-Line. (Plaintiffs' Ex. 63 – 64)(emphasis supplied). A copy of this e-mail was sent to Kathy Williams, who was the number three listed person on the Cross Functional Team list of names, (Ex. 40), and to Mr. Ginn, who was also on the Cross Functional Team.[5]

The jury could fairly conclude (although it would not be required to do so) that Ms. O'Neil's e-mail, when read in light of her involvement with the 2006 and earlier bids and contracts (Defendants' Ex. 102) and her involvement on the Cross Functional Team, constituted a recognition that Dura-Line had, in fact, bid Lozon's products and that her e-mail was an unqualified statement that it had – just as the objected-to entries on page 5 and 8 of the Verizon report state. A copy of her October 25 e-mail to Mr. Maynard was sent by Ms. O'Neil to Mr. Grimsley, who immediately sent it on to Mr. Lundeen. Neither, however, contacted Mr. Maynard or the plaintiff.

Mr. Grimsley claimed Ms. O'Neil called him the day of her e-mail, and he told her B&C couplers were being bid. He had not told her this before the bid was submitted in August 2006. It will be for the jury to determine whether to accept this testimony, which he conceded is unsupported by any document in the case, including any e-mail to Mr. Lundeen, despite the presence in the

_____

[4] This e-mail was received without objection and is admissible to show circumstantially that Mr. Maynard and Lozon believed that the Lozon coupler had been bid by Dura-Line.

[5] Ms. O'Neil was sufficiently important and had sufficient authority that Mr. Lundeen suggested to Mr. Grimsley that he contact her for an extension on the response time to respond to the RFQ. (Plaintiff's Ex. 38).

record of all manner of e-mail exchanges between the two.

Since Exhibits 63 and 64 were received without objection, Ms. O'Neil's statement is in for the truth of the matters asserted. Hence, even if the statements on pages 5 and 8 were received for the truth of the matters asserted – which they were not – the Verizon report confirms what other evidence, received without objection from the defendants, would allow the jury to conclude.

In light of the introduction of Exhibits 63 and 64, and the other evidence discussed earlier, (including the plaintiff's expert's explicit reliance on the statements on pages 5 and 8 of Ex. 40), it is difficult to agree with the defendants that the introduction of Exhibit 40 would result in significant or unfair prejudice – even if it were not being offered for the limited purpose for which it will be received. "The admission of hearsay evidence that is cumulative of earlier trial testimony by the declarant or cumulative of other hearsay evidence to which no objection was made is not likely to influence the jury and is therefore harmless error." *United States v. Londondio,* 420 F.3d 777, 789 (8th Cir.2005). *See also United States v. Gettel,* 474 F.3d 1081, 1090 (8th Cir.2007); *United States v. Trujillo,* 376 F.3d 593, 612 (6th Cir.2004) (admission of hearsay deemed harmless where it was merely cumulative of other significant evidence). As Justice Breyer observed in his dissenting opinion in *Tome v. United States,* 513 U.S. 150, 115 (1995), "even in cases where the [prior consistent] statement is admitted as significantly probative ... the effect of admission on the trial will be minimal because the prior consistent statements will (by their nature) do no more than repeat in-court testimony." *Id.* at 176 (parenthesis in original). This is such a case. *Cf. Munoz v. Strahm Farms, Inc*., 69 F.3d 501, 504 (Fed. Cir. 1995)("Even assuming that the district court erred in admitting the challenged evidence, such error would have been harmless. The correction of an error must yield a different result in order for that error to have been harmful and thus prejudice a

substantial right of a party. ... Mayberry's testimony and dated slide frames were merely cumulative of other evidence admitted at trial.").

Prior to the testimony given by Mr. Grimsley on February 13, 2012, it was the plaintiff's position that the Verizon report would be offered only to show that the statements were made, which would permit the jury to draw the inference that it was Verizon's perception that the Lozon coupler was an acceptable product, and that it was Verizon's perception that Duraline had bid the Lozon coupler. This is a relevant nonhearsay use and does not trigger the hearsay rule. *See supra* at 2-3. *See United States v. Cain,* _F.3d_, 2012 WL 265882 (2nd Cir 2012); *T Reno Newspapers Inc., v. U.S. Parole Commission,* 2011 WL 1233477, 8 (D.Nev. 2011*)*; *In re ING Groep, N.V. Erisa Litigation,* 749 F.Supp.2d 1338, 1344 (N.D.Ga. 2010). This is the use that Mr. Degen, the plaintiff's damages expert, made of Exhibit 40 in his testimony. *See generally, Tennessee v. Street*, 471 U.S. 409 (1985); *United States v. Harvey*, 959 F.2d 1371, 1375 (7th Cir. 1992); *Taylor v. Molesky*, 63 Fed.Appx. 126, 131, 2003 WL 21089147, 4 (4th Cir. 2003); Wigmore, Evidence § 1766 (1940 ed.);. *Minemyer,* 2012 WL 379904; *Minemyer,* 678 F.Supp.2d at 709.

Alternatively, the statements on pages 5 and 8 can be viewed as an exception to the hearsay rule under Rule 803(3). *See e.g., Catalan v. GMAC Mortgage Corp.*, 629 F.3d 676 (7th Cir. 2011)(statements by bank teller not offered to prove the truth of the matter asserted but as reflecting the bank's then-existing state of mind); *Rider v. Westinghouse Elec. Corp.*, 128 F.3d 128, 134 (3rd Cir. 1997)(comments by unidentified executives were not hearsay since not offered for their truth but as circumstantial proof of managerial viewpoint); *Schering Corp. v. Pfizer, Inc.*, 189 F.3d 218 (2nd Cir.1996); *Fun-Damental Too Ltd. v. Gemmy Ind. Corp.*, 111 F.3d 993 (2nd Cir.1997)

(statements by retail customers to national sales manager probative of customers' confusion).[6]

That is where things stood until Mr. Grimsley testified on February 13. During his "direct examination" by the plaintiff, he repeatedly *volunteered* – and not in response to questions asked – that Verizon knew that the B&C coupler was being bid by Dura-Line, that no one at Verizon ever thought they had been misled, and that they knew everything about what was being bid. Counsel for the plaintiff did not ask Mr. Grimsley to explain the volunteered statements or to explain how he came to that conclusion. On examination by his own counsel, however, Mr. Grimsley testified in detail about the conversations he claimed he had with Mr. Ginn in Philadelphia in late September, prior to the award of the bid in late October. He said he told Mr. Ginn that Dura-Line was bidding the B&C coupler and gave him samples clearly marked "B&C." He also testified that he had a conversation with Ms. O'Neil in October when she responded to Mr. Maynard's e-mail. He said that she had called him and that he told her that the B&C coupler was what was bid. He testified the next day that "he had absolutely no doubt" that Verizon knew what was being bid by Dura-Line.[7]

Mr. Grimsley's testimony requires a further assessment of the rationale for admitting Plaintiff's Exhibit 40. At the close of the testimony on February 13, I told counsel that Mr. Grimsley's testimony warranted a re-examination of the limitations that would be imposed on the

---

[6] Statements expressing the declarant's then existing state of mind fall within the hearsay exception in Rule 803(3). Wigmore distinguished between direct expressions of mental state or emotion and statements that circumstantially evidence a particular state of mind. Often the distinction is blurry, and cases treat the two kinds of evidence interchangeably. *See e.g., United States v. Hartmann*, 958 F.2d 774 (7th Cir.1992). The method of treatment, however, does not affect admissibility, only its analytical basis. *Minemyer*, 678 F.Supp.2d at 710, n.10. *See United States v. Sackett*, 598 F.3d. 739, 742 (2nd Cir. 1979).

[7] Mr. Grimsley's testimony about these conversations was admissible to show that Verizon had notice of what had occurred in the bidding and was not itself barred by the hearsay rule.

use the jury would be permitted to make of Exhibit 40. I explained that the Cross Functional Team's report's reference, "bid Lozon," was arguably, the jury could find, inconsistent with Mr. Grimsley's testimony regarding his conversations with Ms. O'Neil and Mr. Ginn, both of whom were on the Cross Functional Team, along with Kathy Williams, who had been copied on Ms. O'Neil's e-mail to Mr. Maynard.

This, of course, will be for the jury to decide. But to do so intelligently and fairly, it must be able to make use of the document in a way not allowed by the instruction I had originally proposed to give – an instruction that had been discussed before Mr. Grimsley's testimony about his conversations with Mr. Ginn and Ms. O'Neil.[8]

The solution to the problem is not difficult and is fair to both sides. Exhibit 40 will still not be admitted for the truth of the matter asserted, namely that Dura-Line bid Lozon products or that it was an advantage of the Dura-Line bid that it had bid the Lozon coupler. Rather, those statements will be received simply to show that they were made and if the jury thought it proper, they could conclude that it was Verizon's perception that the Lozon couplers had been bid by Dura-Line and that Verizon perceived them as an acceptable and quality product.[9] And from Verizon's perception,

---

[8] Prior to that testimony, I read to counsel the limiting instruction I proposed to give. That instruction, of course, was based on the state of the evidence as it existed. No one on the defense team told me that Mr. Grimsley would be volunteering his story about Ms. O'Neil and Mr. Ginn or that they would be eliciting the details of those claimed conversations and meetings. It is idle to suggest that the defense did not know what was coming. The fact that I knew about the Ginn affidavit is quite beside the point. It is not a judge's job to anticipate testimony and make rulings with that anticipated testimony in mind.

[9] The instruction will tell the jury:

Plaintiff's Exhibit 40 is a document produced by Verizon during the discovery phase of this case in response to a subpoena from the plaintiff. There is a statement on page 8 referring to Dura-Line that states under the heading "Advantages" "Bid Lozon." A similar statement appears on page 5. Mr. Degen has discussed these entries in his testimony this morning. I want to repeat the instruction I gave you at that time. The entries on pages 5 and 8 are not being offered for the truth of the matter
(continued...)

the plaintiff will be able to argue, *inter alia*, that Verizon's perception of what was bid bears on Mr. Grimsley's testimony concerning his claimed conversations with Ms. O'Neil and Mr. Ginn. This non-hearsay use of the statements does not offend the hearsay rule. The defendants, of course, will be free to argue to the jury why that inference is not reasonable and why the plaintiff's interpretation of the Verizon report ought not be accepted. Of course, it will be for the jury to make whatever use, if any, they think appropriate of the evidence of Verizon's perception of what was bid.

## B.

Rulings on motions *in limine* are by definition preliminary and are subject to change as the case unfolds. *Ohler v. United States,* 529 U.S. 753, 758 (2000). They "are not binding on the trial judge, and the judge may always change his mind during the course of a trial." *Id. See also Luce v. United States*, 469 U.S. 38, 41-42 (1984) (noting definition of "*in limine*" as "on or at the threshold; at the very beginning; preliminarily"). "Indeed even if nothing unexpected happens at trial, the district judge is free, in the exercise of sound judicial discretion, to alter a previous *in limine* ruling." *Luce,* 469 U.S. at 41; *United States v. DePriest*, 6 F.3d 1201, 1209 (7th Cir. 1993). This is the rule in patent cases in the Federal Circuit. *Ultra-Precision Mfg. Ltd. v. Ford Motor Co.,* 338 F.3d 1353, 1359 (Fed Cir.2003).

Here, much occurred on the second day of trial, and more would occur on succeeding days.

---

[9](...continued)
asserted – namely that Dura-Line bid Lozon couplers or that it was an advantage of the Dura-Line bid that Lozon couplers were bid. Rather, those statements are offered solely to show that it was Verizon's perception that Dura-Line had bid Lozon couplers and that it was Verizon's perception that that was one of the advantages of the Dura-Line bid. It is for you to determine whether that was Verizon's perception and, if you determine it was, it is for you to determine what inferences, if any, are to be drawn from that perception. You will hear in closing argument what the lawyers think those inferences should be. But whether to draw those inferences or any others you might find reasonable and supported by the evidence – or to draw no inference at all – is a matter solely for you to decide.

As explained in the February 6 opinion, the defendants, at an extensive pretrial conference that took place only a few days before the trial commenced, essentially conceded the accuracy of virtually all statements made in the Verizon report, with the exception of that on page 8 (and 5), which lists as an "Advantage"of the Dura-Line bid, that Dura-Line "Bid Lozon products." *Minemyer*, 2012 WL 379904, 3.[10] Those concessions largely, if not completely, remove any concerns about the hearsay rule as applied to the statements whose accuracy was conceded or not contested, as explained in the February 6 opinion, are significant in authenticating the document.

The "primary justification for the exclusion of hearsay is the lack of any opportunity for the adversary to cross-examine the absent declarant" to determine the truthfulness of his statements. *Anderson v. United States,* 417 U.S. 211, 219-220 (1974). Thus, unless the statement is offered for the truth of the matter asserted, the hearsay rule has no application, for the credibility of the declarant is irrelevant. *Anderson, supra*; *United States v. Chung*, 659 F.3d 815, 833 (9th Cir. 2011); *Minemyer*, 2012 WL 379904, *4. In that context, it is not the credibility of the person who made the statement that is important, but that of the intermediary who relates it. *United States v. Williams*, 133 F.3d 1048, 1051 (7th Cir. 1998). It follows that where, as here, a party concedes the truthfulness of an out-of-court declaration, the need for cross-examination vanishes as to the particular statement, thereby making the hearsay rule inapplicable. Of course, as to the disputed items on pages 5 and 8 of the Verizon report, the hearsay rule applies with full vigor – if offered for the truth of the assertion that Lozon couplers were bid by Dura-Line.

In the final analysis, the defendants' objection to Plaintiff's Exhibit 40 and the "unfair prejudice" they insist they will suffer from its admittance are analytically irrelevant, for the evidence

_____

[10] As explained in the February 6 opinion, those concessions came after a page-by- page, line-by- line review of the Verizon report.

of the statement on pages 5 and 8 of the Verizon report are not being offered and will not be received for the truth of the two assertions that Dura-Line bid Lozon products. When plaintiff's Exhibit 40 is received, the jury will be given a cautionary instruction that informs the jury that the statements in Exhibit 40 are admitted solely to prove Verizon's perception of the matters stated on pages 5 and 8 (and on certain other pages of the exhibit).

## C.

The defendants contend that Exhibit 40 is different than the O'Neil e-mail and gives the stamp of unqualified truthfulness to the statement on pages 5 and 8 that Dura-Line bid Lozon products, in a way that in Ms. O' Neil's e-mail does not. They also object to the entries since they say it cannot be ascertained who wrote the report or whether only some or none of the other Team members agreed with the statement. But these are arguments that go to the weight, not the admissibility of the document.[11] The defendants will be free to argue that the Verizon report is essentially uninformative for any purpose, and they can advance, in support of the argument, whatever reasons they think might be compelling and appealing to the jury. But just as "shaky" expert testimony is not for that reason inadmissible, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 596 (1993), neither is testimony or evidence that may be open to some challenge. In all cases, vigorous cross examination, presentation of contrary evidence and careful jury instructions are the traditional and appropriate means of attacking evidence under our adversary system. *Minemyer*, 2009 WL 3757378, *3, *7 (N.D.Ill. 2009).

---

[11] The argument that the report is undated and thus one cannot know when it was prepared is unconvincing. The text and structure of the report will allow the jury to decide whether it was prepared before or after the bid was awarded. As to the exact identity of the author or authors of the document, that seems irrelevant, for it is a document issued under the auspices of the Cross Functional Team, and thus is a report by Verizon, itself.

The argument about the significance of plaintiff's Exhibit 40, *vis-a-vis* the O'Neil e-mail, is based on the tacit assumption that Ms. O'Neil did not and could not know what she was talking about regarding the identity of the bidder, and that she was merely repeating in her response what Mr. Maynard had said to her in his e-mail: "We have been supplying Verizon couplings for the last few years. We passed on going direct with Verizon and preferred to stay distributing through Dura-Line since we started with them."  But this is a jury argument regarding the weight to be given to Exhibits 63 and 64, not a basis on which to exclude Exhibit 40, a separate document that is relevant to the case.

Moreover, the defendants' lawyers certainly knew that the premise of the argument was seriously at odds with the evidence relating to Ms. O'Neil's participation on the Cross Functional Team and her significant involvement in connection with current and previous Verizon/Dura-Line contracts, which she executed on behalf of Verizon.  (Defendants' Ex. 102). These will all be matters for the jury's informed consideration.

**D**.

It must be acknowledged that the defendants' motion *in limine* excluding Exhibit 40 was not upset by the February 6 opinion.  But the concerns expressed in those opinions were made on a very different record then now exists, and the issue raised in the summary judgment ruling in 2009 is not the same as that now presented.  The 2009 opinion granting the defendants' Motion for Summary Judgment on their trade dress claim found that the Verizon report was not sufficient to raise a material issue of fact on whether Verizon was confused about the couplers it was receiving from Dura-Line because of the trade dress of the couplers.

As the 2009 summary judgment opinion noted, the only thing anyone knew about the

Verizon report was that it came from Verizon's files. No affidavit was submitted by the plaintiff from anyone at Verizon. *Minemyer*, 678 F.Supp.2d at 710. As the opponent of the motion, the plaintiff was required to do more than raise metaphysical or speculative doubt as to the material facts. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574 (1986). The opinion itself focused on confusion about the product's similarities in physical appearance and whether the otherwise unexplained evidence from Verizon's files was sufficient to raise an issue of fact that Verizon did not understand what it was buying as a consequence of the similarity in appearance between the Lozon and B&C couplers.

The opinion concluded that the evidence presented by the plaintiff was insufficient to show that even the author of report (whoever it might have been) was confused about the source because of the products' trade dress. The report could just as easily show possible confusion about what the bidders were going to use as a basis for the bid based on information received from some third party "rather than based upon some confusion generated by the products' physical similarities." But, the opinion stressed, basic summary judgment principles did not allow the party with the burden of proof to show the existence of a disputed issue of material fact merely by drawing '[i]nferences that are supported by only speculation or conjecture.'" *Minemyer,* 678 F.Supp.2d at 710. The summary judgment opinion held that on the abbreviated record before the court, it could not be concluded that the plaintiff had shown there was a material issue of fact on the question of whether Verizon was confused *as a consequence of the coupler's appearance*. *Id*.

Those observations and assessments must be viewed in that fact-specific and narrow context of the summary judgment proceeding in which they were made. *Cf.*, *Aurora Loan Services, Inc. v. Craddieth*, 442 F.3d 1018 (7th Cir. 2006)(Posner, J.); *Wisehart v. Davis*, 408 F.3d 321, 326

(7th Cir. 2005)(Posner, J.). The record in the instant case is obviously far different and infinitely more developed than it was in 2009, and the concerns expressed in the confined context of the summary judgment proceeding do not control the very different evidentiary question now raised. The defendants' failure to note the context in which statements in opinions are made is a problem that has arisen before in this case. *See Minemyer*, 2009 WL 3757378, 5.

**E.**

A final word. Perhaps the most strongly voiced objection by the defendants to the receipt of plaintiff's Exhibit 40 (for any purpose) is that had they known it would be admitted, they would have dramatically changed their entire trial strategy. They harkened back to Mr. Ginn's affidavit in 2009 stating that Verizon was not confused about what was bid and actually had, before the bid was awarded, samples of the B&C coupler. They said that they would have called him (or someone else from Verizon) – apparently to show that the Lozon coupler was not being bid by Dura-Line and that Verizon knew it – had they known Exhibit 40 would be admitted.

There are two flaws in the contention. First, the report is not being admitted to prove that Dura-Line bid Lozon products – even though the document is admissible for that purpose under Rule 803(3). Second and more importantly, the self-serving claim is inconsistent with the historical record of what has occurred in this case and ignores the evidence that for several years the plaintiff's team of lawyers knew it would be confronted with at trial.

To any competent lawyer – and the defendant's lawyers are far more than merely that – the evidence of which they have been aware for several years posed the very risk they claim inheres in Exhibit 40 – namely that Dura-Line in fact bid Lozon to secure the contract. The defendants' current position simply puts out of view that evidence, which came from their own files and about which

they knew since before the case began. Equally, they had to know that the plaintiff's lawyers would use this evidence to maximum advantage and would vigorously argue to the jury that it demonstrated that the defendants had indeed bid Lozon products, all the while knowing that it would be supplying the B&C coupler. If they chose to run the risk of meeting that evidence without the help of someone from Verizon to say that Verizon was always aware that the B&C coupler had been bid by Dura-Line, they have no one to blame but themselves for what may prove to have been an imprudent strategic decision. That decision was simply not prompted by the initial and as a matter of law preliminary decision not to admit plaintiff's Exhibit 40.

The hollowness of the defendants' claim is perhaps best demonstrated by the fact that they took no action to preclude the plaintiff's expert from relying, as he did in his July 2009 expert report, that in plaintiff's Exhibit 40 it was expressly stated that Dura-Line bid Lozon products. Even though the plaintiffs knew three years ago about this reliance, not only did they not file any *Daubert* motion, *see supra* at 2, they made no attempt to reopen discovery for the limited purpose of deposing Ms. O'Neil, Mr. Ginn or anyone else at Verizon. That failure made it inevitable that the jury would learn what was stated in the Verizon report when the expert testified without any rejoinder from a Verison employee. Whether the document, itself, was actually admitted was of little moment, given the expert's testimony.

Yet, despite their knowledge that from the beginning of the case it was the plaintiff's theory that Dura-Line had bid the Lozon coupler,[12] and despite their knowledge from the beginning of the case of the significant and potentially harmful evidence (that came from their own files) that the

---

[12] This case has been pending for years, and there were numerous conferences of varying kinds, often lasting several hours, that the court had with counsel. This was a topic that was discussed frequently, with counsel for the defendants always insisting that plaintiff's counsel had it all wrong, and plaintiff's counsel insisting they didn't.

plaintiff would rely on to support this thesis, they never attempted to depose anyone from Verizon to support the claim that Verizon knew all along that Dura-Line had bid the B&C coupler. In short, the defendants' contention that if they had only known that Exhibit 40 would be received, even in some limited capacity, their whole trial strategy would have changed is unpersuasive.

The defendants' lawyers of course knew of their clients' efforts in April 2006 to begin having new molds made to enable them to copy the Lozon coupler (Plaintiff's Ex. 19), and of the extensive and comprehensive tests they caused to be run to determine the exact chemical composition of the Lozon coupler so that the B&C coupler would have the same composition. (Plaintiff's Ex. 23 ). They of course knew of their clients' efforts to conceal from the plaintiff what they were doing and of their persuading him not to bid the new Verizon project directly, so that Dura-Line and B&C could secure the contract for themselves. And they knew that they did not keep plaintiff apprised of Dura-Line's bid to Verizon in response to the RFP, despite their knowledge that the plaintiff was under the continuing impression that Dura-Line had bid the Lozon coupler. While the defendants' lawyers would insist that their clients had done nothing wrong, they knew with certainty that the plaintiff would draw very different inferences from the evidence. And they knew or should have known that the evidence was of such a nature that a jury could certainly draw negative inferences from it and come to conclusions that would not favor the defendants.

The defendants' lawyers additionally knew of Ms. O'Neil's statements in her October 2006 e-mail in response to Mr. Maynard's attempt to learn the status of the RFP and whether the contract had been awarded. They knew that in her e-mail she stated, (or it certainly appeared that she did), that Dura-Line had bid Lozon couplers. Indeed, as noted above, Mr. Grimsley of Dura-Line, who was copied on the e-mail to Mr. Maynard, immediately upon his receipt of Ms. O'Neil's October

25 e-mail to Mr. Maynard, forwarded it to Mr. Lundeen. (*See* Plaintiff's Exs. 63 and 64). And of course the defendants' very sophisticated lawyers knew or should have perceived that the O'Neil e-mail was susceptible of being read as a positive statement by someone intimately involved in the bid and contract that Dura-Line had bid Lozon. Finally, they knew or should have known that the interpretation they are giving to the e-mail as merely a repetition by Ms. O'Neil of what was being said by Mr. Maynard could easily be rejected by the fact finder, given Ms. O'Neil's involvement in the Dura-Line bid and the award of the contract.

The defendants' lawyers also knew from the beginning about the evidence disclosed in their own e-mails regarding Mr. Ginn and Mr. Grimsley. (Plaintiffs' Ex. 12). They certainly knew that their clients' own e-mails would form the basis for and at least appear to support the argument that Mr.Ginn was designing the Verizon specification for the 2006 bid with the Lozon product in mind. (*See* Plaintiff's Ex. 12).[13] In fact, during his testimony, Mr. Lundeen conceded that a person working with him in connection with the bid had persuaded Mr. Ginn to design the specification based upon the Lozon coupler – an accomplishment Mr. Lundeen said justified the conclusion that he had "really earned his money that day."

And there is Mr. Grimsley's dramatic testimony on February 13, 2012 that he told Ms. O'Neil in October, before the contract was awarded, that Dura-Line was bidding the B&C coupler, and that he gave Mr. Ginn samples of the B&C coupler in July, 2009, before the contract was awarded and that Mr. Ginn knew the B&C coupler was being bid. Defendants' lawyers could have

_____

[13] The defendants' examination of Mr. Grimsley on February 13 was designed to show that the Verizon specification in fact did not favor Lozon and was not based on the Lozon coupler. It remains for the jury to determine where the truth lies. Thus, the defendants' claim that the e-mail traffic regarding Mr. Ginn's design of the Verizon specification proves nothing, simply assumes rather prematurely that which the jury has yet to decide.

been under no illusions that his testimony would be subject to attack, including the fact that there was not a single document in the many thousands of pages that comprise the documentary record in this case that supports his claimed disclosures.  Indeed, although Mr. Grimsley and Mr. Lundeen constantly exchanged e-mails, there is not one even hinting that there was a meeting in Philadelphia with Mr. Ginn.

And they surely knew that the jury would be free to reject his testimony and view it as a tale spun for the occasion.  *Pickett v. Sheridan Health Care Center,* 610 F.3d 434, 441 (7th Cir.2010); *Power-One, Inc. v. Artesyn Technologies, Inc.,* 599 F.3d 1343, 1351 (Fed.Cir.2010); *Kinetic Concepts, Inc. v. Blue Sky Medical Group, Inc.,* 554 F.3d 1010, 1024 (Fed.Cir. 2009); *The Johns Hopkins University v. Datascope Corp.,* 543 F.3d 1342, 1344 (Fed.Cir.2008).  Surely they had to have been aware that "[t]he demeanor of a witness... may satisfy the tribunal not only that the witness' testimony is not true but that the truth is the opposite of his story; for the denial of one, who has a motive to deny, may be uttered with such hesitation, discomfort, arrogance or defiance, as to give assurance that he is fabricating, and that, if he is, there is no alternative but to assume the truth of what he denies."'  *NLRB v. Walton Mfg. Co.*, 369 U.S. 404, 408 (1962). *See also Anderson v. Bessemer City,* 470 U.S. 564, 575 (1985).  Yet, aware of all this and aware that there was not a single e-mail or other document to support his story, they elected not to call Mr. Ginn as a witness or to depose him during discovery.  And so, his testimony stood in isolation, not only unsupported affirmatively by anything in the record before the jury, but open to serious question on that record.

The defendants' counsel now may say what they will about how significant the statement on pages 5 and  8 of the Verizon report is and how, without them, there is essentially no proof that Dura-Line bid the Lozon coupler, and that once the Verizon report was excluded they saw no need

to call anyone from Verizon as a witness at trial. Apart from the fact that this argument does not explain the defendants' failure to have deposed Mr. Ginn, Ms. O'Neil, or anyone else at Verizon during discovery, no lawyer could have failed to recognize the use to which the above-described evidence – and this is but an adumbration of the evidence in the record – was going to be put or could have thought that without Ex. 40 there was no need to independently demonstrate that the B&C couplers were bid and that Verizon knew it. (*See generally* Plaintiff's Exs. 12,17, 18,19, 27, 29, 36, 41, 44,45,46, 47; Defendants' Ex. 101).[14]

The exclusion of Exhibit 40 did not eliminate all the other evidence that bore on the question of what was bid and Verizon's understanding of what was bid, did not eliminate the inconsistencies in the testimony of Mr. Grimsley and Mr. Lundeen, and did not eliminate Ms. O'Neil's e-mail in which she said to Mr. Maynard that Dura-Line bid Lozon. (Plaintiff's Ex. 63). The fact remains that that e-mail, itself, could be viewed by the jury as exceedingly telling, especially given the other evidence the plaintiff has introduced from which a jury could reasonably conclude that Dura-Line had bid the Lozon coupler.

It is, thus, unconvincing for the defendants to contend in the face of evidence with which they were intimately familiar even before the case began that they would have drastically altered their trial strategy and called someone from Verizon had they known that plaintiff's Exhibit 40 would be admitted. The defendants' lawyers made a conscious decision not to depose anyone at Verizon when they had the chance to do so during discovery or call any Verizon employee as a witness at trial, notwithstanding the undeniable risks entailed by that decision. Perhaps they thought

---

[14]Again, this is not to judge the case, the credibility of the witnesses, or the force of the evidence. It is merely to note that no lawyer could have failed to see the dangers from failing to corroborate Mr. Grimsley's story that Verizon knew what was going on because Mr. Grimsley told Ms. O'Neil and Mr. Ginn. There are no sure winners, as anyone who tries cases knows.

the risks minimal and not worth bothering Verizon, which, after all, was a significant customer, as one of the counsel for the defendants conceded in a discussion about the issue.[15] Perhaps there were other reasons. It matters not. What they cannot argue persuasively is that their decision stemmed from the decision granting in 2009 the motion *in limine* to exclude Exhibit 40.

**F.**

On February 15, Mr. Degen was cross examined by counsel for the defendants, who extensively utilized and relied on plaintiff's Exhibit 40. That examination was not limited to the two statements on pages 5 and 8 which had been admitted solely to show Verizon's perception. Rather, at least eight other pages of the report were utilized as the basis for attacking Mr. Degen's testimony or to support the defendants' approach to the case. The plaintiff then rested, and the defense called Mr. Peterson, their expert. At least seven, and perhaps eight times, he voluntarily referred to various portions of plaintiff's Exhibit 40 to illustrate and support points he was making. Not surprisingly, counsel for the plaintiff asked that in light of the extensive, affirmative use being made by the defendants of Exhibit 40, I reconsider my ruling limiting the use the jury could make of the exhibit. I explained that although the plaintiff had indeed now affirmatively utilized large segments of the the document to support its case, and that this use would justify granting the motion to reconsider, and to admit the document without the limitation imposed, *compare Ball v. Trusler*, 1999 WL 422962, 2 (5th Cir. 1999); 4 Weinstein's Federal Evidence, §703.05[2], I would not do so and my

---

[15] She insisted that if defense counsel thought it necessary they would have gone ahead and taken the appropriate action. This exchange is recorded on the record. It may be noted that the defendants were not shy about getting an affidavit from Mr. Ginn in support of their 2009 motion for summary judgment. Of course, "paper is patient" as Justice Frankfurter was fond of saying, and testifying at a trial is not the same as filling out an affidavit.

ruling limiting the purpose for which Exhibit 40 would be received (as discussed above), would stand.

DATE: 2/15/12    ENTERED: _____
           UNITED STATES MAGISTRATE JUDGE