IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JOHN T. ("TOM") MINEMYER,

        Plaintiff,

    v.

R-BOC REPRESENTATIVES, INC., et al.,

        Defendants.

Civil Action No. 07-CV-1763

Magistrate Judge Jeffrey Cole

## <u>DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW ON DAMAGES</u>

Defendants move for partial judgment on the issue of damages and ask the Court to find as a matter of law that Plaintiff is not entitled to lost profits. Plaintiff's expert, Mr. Degen, based his entire lost profits analysis on unreliable, inaccurate, and inconsistent data, which cannot support an award of lost profits. In short, Plaintiff wholly failed to meet the *Panduit* criteria advanced by his expert, and no reasonable jury would have a legally sufficient basis to award lost profits.

## I.    Legal Standard For Judgment As A Matter of Law

Judgment as a matter of law ("JMOL") is governed by Federal Rule of Civil Procedure 50, which states in pertinent part:

> (a)    Judgment as a Matter of Law.
> (1)    In General.
> If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may:
> (A)    resolve the issue against the party; and
> (B)    grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

Fed. R. Civ. Proc. 50.

"The grant or denial of a motion for judgment as a matter of law is a procedural issue not unique to patent law, reviewed under the law of the regional circuit in which the appeal from the district court would usually lie." Summit Tech., Inc. v. Nidek Co., 363 F.3d 1219, 1223 (Fed. Cir. 2004).   Under Seventh Circuit law, when deciding a JMOL, the Court must "view the evidence in the light most favorable to the nonmoving party . . . and draw all reasonable inferences in his favor." Riemer v. Illinois Dept. of Transp., 148 F.3d 800, 805 (7th Cir. 1998). If the evidence does not support a jury award in favor of Plaintiff, then JMOL should be granted in favor of Defendants.  See id.

## II.    The Jury Does Not Have A Legally Sufficient Evidentiary Basis To Award Plaintiff Lost Profits

There is no legally sufficient evidentiary basis upon which the jury could award Plaintiff lost profits.[1]  Upon a finding of infringement, the patentee is entitled to an award of damages that will adequately compensate for the infringement, "but in no event less than a reasonable royalty."  35 U.S.C. § 284.  "The patent owner bears the burden of proving this amount" by a preponderance of the evidence.  Oiness v. Walgreen Co., 88 F.3d 1025, 1030-31 (Fed. Cir. 1996) (emphasis supplied).  "To recover lost profits, the patent owner must show 'causation in fact,' establishing that 'but for' the infringement, he would have made additional profits."   Grain Processing Corp. v. Am. Maize-Products, 185 F.3d 1341, 1349 (Fed. Cir. 1999); see also Oiness, 88 F.3d at 1029.

Plaintiff elected to seek lost profits, and his expert, Carl G. Degen, pursued the Panduit test for establishing lost profits.  See Panduit Corp. v. Stahlin Bros. Fibre Works, Inc., 575 F.2d 1152, 1156.

> To obtain as damages the profits on sales he would have made
> absent the infringement, i. e., the sales made by the infringer, a
> patent owner must prove: (1) demand for the patented product, (2)

---

[1] Defendants will provide citation to the record after the official transcript becomes available.

> absence of acceptable noninfringing substitutes, (3) his
> manufacturing and marketing capability to exploit the demand, and
> (4) the amount of the profit he would have made.

Id. at 1156.

Plaintiff's proof on all of these factors is insufficient to meet his burden of proving damages by a preponderance of the evidence. The most stark failure of proof concerns what is arguably the most important factor, "the amount of profit he would have made" absent the infringement, and thus Defendants' analysis starts there. See Panduit, 575 F.2d 1152, 1156.

### A. Plaintiff Failed To Prove The Profit He Would Have Made Absent Infringement

Plaintiff's damages expert, Mr. Degen based his entire lost profits analysis on unreliable, inaccurate, and inconsistent data, which cannot support an award of lost profits. Mr. Degen admitted that he had not been given an entire set of Plaintiff's financial records, and there are material differences between the data that Plaintiff shared with his expert and the information he shared with the tax authorities. "Without credible economic testimony, this court cannot permit a jury to base its award on speculation." Oiness, 88 F.3d at 1033; see also Sommerfield v. City of Chicago, 254 F.R.D. 317, 321 (N.D. Ill. 2008) (Cole, J.) (an "expert's opinion [must be] be grounded on reliable information."). This Court emphasized that this "insistence on reliability . . . is of such transcendent importance that judges can act sua sponte to prohibit testimony that does not pass muster under Daubert." Id. at 318. Although the Court did not strike Mr. Degen's testimony, it is insufficient to raise a question for the jury.

The cost data upon which Mr. Degen relied was fatally inaccurate. Cost data, of course, is a fundamental and indispensable component of any lost profits calculation. By his own admission, Mr. Degen's lost profits calculation relies on conclusory, unsupported and untested cost data provided by Plaintiff Minemyer. In this regard, Mr. Degen testified that he did not have an understanding of where the cost data, upon which he relied, came from -- other than it

was provided by Mr. Minemyer, who represented to Mr. Degen that the number represented Mr. Minemyer's incremental costs. Mr. Degen admitted that Mr. Minemyer did not take him through the QuickBooks database or how Mr. Minemyer arrived at the number he gave Mr. Degen. Mr. Degen further admitted he did no independent analysis to calculate or verify the cost data - nor did he have any idea of how Mr. Minemyer maintained the cost data in QuickBooks or whether any of the data had been modified.

Mr. Degen admitted that the sole source of the historical Lozon revenue, cost, and profit information came from a QuickBooks file entitled, Lozon 11908.qbb, an electronic copy of which was produced by Plaintiff in this matter and made part of the record (DX-46). The QuickBooks database was the only financial data of Plaintiff's that Mr. Degen and his associates reviewed in formulating Mr. Degen's opinions.

Mr. Degen's sole reliance on Lozon 11908.qbb is problematic for a few important reasons. As an initial matter, the cost data provided in Lozon 11908.qbb, contradicts the cost data specified on Mr. Minemyer's 2005 federal income tax return – and does so dramatically. Compare DX-46 and DX-51. When Mr. Minemyer sought to reduce his tax burden in 2005 by (presumably legitimately) reporting the cost of goods sold by Lozon, he reported the dollar amount of good purchased by Lozon as $731,137. (DX-51.) However, when Mr. Minemyer produced cost information to Mr. Degen for the purposes of this litigation, he represented the cost of goods figure to be a mere $575,434 – an inexplicable difference of $155,703 – representing a 27% decrease, which would dramatically raise Plaintiff's purported lost profits. (DX-46). Notably, Lozon's income figures as reported in Mr. Minemyer's 2005 Tax Return and his Profit & Loss Comparison are consistent.

Thus, the cost figure on which Mr. Degen relied in preparing his lost profits analysis was substantially less than the cost figure Mr. Minemyer presented in his 2005 federal income tax return. And, Mr. Degen relied on the former *without investigating the obvious discrepancy*.

What makes this inconsistency even more troubling, however, is that during the course of discovery, as explained by Mr. Peterson, Defendants' expert, Mr. Minemyer produced other *QuickBooks* database files to Defendants that include figures that are entirely consistent with the cost and income information presented in Mr. Minemyer's 2005 tax return – and this additional information was *not* provided to Mr. Degen.

Specifically, Mr. Minemyer produced to Defendants (but not to Mr. Degen) other electronic "check registries" from a QuickBooks database. These additional databases identify Lozon's income for 2005 as $1,265,300.21 – the very same income amount included in Minemyer's 2005 tax return. (DX-48 p. 14 of 21 compare Minemyer's 2005 Sole Proprietorship Income Tax Return, Part I, l. 1, DX-51.) As importantly, however, the database identifies Mr. Minemyer's total cost of goods sold for 2005 as $731,136.53. (DX-48 at 14-15, i.e., "Total Molds" at $727,478 + $3,658.53 for additional non-labor cost of goods = $731,136.53.) Not coincidentally, rounded up by just 47 cents, this is the same figure represented on Mr. Minemyer's 2005 tax return as Lozon's non-labor cost of goods. (Minemyer's 2005 Individual Income Tax Return, Part III, l. 36, DX-51.) When questioned at trial, Mr. Degen admitted that he had neither reviewed, nor been provided with, a copy this information.

Despite glaring inconsistencies between the cost figures, Mr. Minemyer provided to Mr. Degen in the QuickBooks database file and as reported on the Profit & Loss Comparison on the one hand, and the cost data Minemyer claimed on his tax returns and recorded in his QuickBooks database, on the other hand, (and despite Mr. Minemyer being a convicted felon for tax fraud, a fact which is not part of the record at trial but which should have been known by Mr. Degen),

- 5 -

Mr. Degen neither questioned Mr. Minemyer about the widely varying cost figures, nor verified the integrity of Mr. Minemyer's electronic QuickBooks business accounting database system, as his testimony at trial confirmed.

Mr. Degen's admitted failure to independently verify the source and accuracy of Mr. Minemyer's "hard-entered" cost figures, compels judgment as a matter of law in favor of Defendants on the issue of lost profits.  "Even where defendant's records are not complete, damages may 'not be determined by mere speculation or guesswork.'"  Oiness, 88 F.3d at 1030 (citation omitted); see also  Lyman v. St. Jude Med. S.C., Inc., 580 F. Supp. 2d 719 (E.D. Wis. 2008) ("exclude[ing] as unreliable expert testimony on behalf of the defendant where the expert did not independently verify the source and accuracy of plaintiff's sales data but rather accepted the summary of the data he received from the defendant's attorney" ) (quoted summary provided in Sommerfield, 254 F.R.D. at 324).

Having had time since his deposition in 2009 to prepare an excuse, Mr. Degen attempted to explain the difference between Mr. Minemyer's litigation cost files and his tax cost files by speculating about what the other costs could be; such as costs related to research and development for projects and products other that the single reverse threaded couplers.  Tellingly, Mr. Degen  had zero documental or testimonial evidence to support his new "theory."

      2.      Degen's Treatment Of Minemyer's Costs As Non-Incremental Costs Rendered His Opinion Unreliable

In addition to this serious proof problem with Mr. Degen's opinion, his methodology for determining costs also renders his calculations unacceptably speculative.  During the infringing time period, Mr. Minemyer's sales were almost exclusively to R-BOC.  See Peterson demonstrative at p. 2.  As such, Mr. Degen should have treated Mr. Minemyer's costs as incremental costs.  Mr. Degen, however, treated these costs as non-incremental, rendering his

entire calculation unreliable and improperly speculative. His sole basis for doing so was reliance on what Mr. Minemyer told him.

### B.     Plaintiff Failed To Prove A Demand For The Patented Product

Plaintiff's evidence about the marketability of his own Lozon coupler, while relevant, critically ignored significant aspects of "demand" prong of Panduit. Plaintiff based the "demand" for the Lozon coupler exclusively on his past sales to Verizon and the much-debated "Verizon Document." However, while Plaintiff's this evidence may demonstrate the Lozon coupler itself was an acceptable product to Verizon, Plaintiff failed to present substantial evidence to establish a link between the claimed invention and the demand. To the contrary, the evidence established that couplers without the claimed invention were sold equally to the Lozon coupler. Moreover, Mr. Minemyer was unable to sell his patented invention despite the enormous market for such a product, beyond the 15% he reached through Dura-Line and R-Boc's connection to Verizon and AT&T.

To prove Plaintiff would have made additional sales "but for" the infringement, Plaintiff should also have shown that it was the claimed features of the '726 patent that were important to the consumer. Grain Processing, at 1354. ("[T]he district court's unchallenged finding that there is no 'economically significant demand for a product having all of the [claimed] attributes' supports its conclusion of availability.") (brackets in original). Like in Grain Processing, Plaintiff merely proved that consumers demand a plastic, reverse threaded coupler, "of which the patented product is just one exemplar." Id. (italics in original). As the court explained in Grain Processing, [b]ecause consumers find the 'waxy' and 'descriptive ration' elements of claim 12 'irrelevant' the prospect of an available, acceptable noninfringing substitute expands because a competitor may be able to drop or replace the 'irrelevant' elements form its product." Grain Processing, at 1354. Plaintiff failed to make that showing. In fact, Mr. Grimsley, the customer,

testified that these features -- the angle of the thread and "sealing surface" were irrelevant to Dura-Line's and Verizon's purchasing decisions. Mr. Minemyer tried to prove demand by making lose arguments that the patented features were reflected in the coupler's overall qualities, e.g. that the thread somehow made his coupler low-profile. The evidence of these connections between the patented features and the coupler's overall qualities were conclusory, at best, lacking the same proof as Plaintiff's overall infringement case. See Defendants' JMOL re Non-infringement. Dkt. No. 453. Because Plaintiff's proof on the demand for the patented product was lacking, JMOL should be granted.

### C. Plaintiff Failed To Prove Absence of Noninfringing Substitutes

Although Mr. Degen's insupportable profits analysis, alone, overcomes Plaintiff's attempt at lost profits, Plaintiff's additional failure to prove absence of acceptable noninfringing substitutes, also supports a grant of JMOL. One of the main factors considered in determining whether lost profits (versus a reasonable royalty) are to be awarded is the availability of substitute products at the time the accused product was produced. *Slimfold Mnfg. Co. v. Kinkead Indus., Inc.*, 932 F.2d 1453 (Fed. Cir. 1991). "[M]arket sales of an acceptable noninfringing substitute often suffice alone to defeat a case for lost profits." *Grain Processing v. American Maize-Products*, 185 F.3d 1341, 1352 (Fed. Cir. 1999). And there is no dispute it is Plaintiff who bears the burden of proving the *lack* of non-infringing alternatives.

In two-producer market, only the infringing product and the patented product are available, supporting an award of lost profits. This is a far cry from such a case. Unfortunately for Plaintiff, the patented technology is not so special or complicated that any other coupler would not do. Mr. Lundeen, Mr. Grimsley, Mr. Maynard, and even Mr. Minemyer himself testified that there were reverse-threaded, plastic couplers on the market at the time of the alleged infringement, including the Jack Moon and Lyall Condu-Grip couplers. The record was replete

with evidence of several other types of acceptable couplers available at the time of the alleged infringement, including plastic push on couplers, aluminum couplers, and two-piece couplers.

Mr. Degen attempted to undermine the myriad available, non-infringing alternatives, by arguing that the alternatives were not as good as the Lozon product and were thus, not "acceptable." For example, Mr. Degen tried to undermine one of the primary substitutes, the Lyall Condu Grip coupler, by proving that it was less expensive than Plaintiff's coupler, which according to Plaintiff shows it was not an acceptable alternative or else Verizon would have opted to purchase more of the lower priced item. However, the testimony from Messrs. Lundeen and Grimsley that these alternative Lyall Condu-Grip couplers, as well as other acceptable, non-infringing alternatives, are sold to the wider market, seen in the field, and used by the ultimate end consumers went unrebutted. Moreover, Mr. Peterson's opinion--that the price premium to Dura-Line was based on factors other than the coupler, such as the service and the ISO quality certification provided by Dura-Line and the "minority content" provided by R-Boc--was consistent with both the Verizon and the AT&T contracts and requests for proposals, which required these terms.

Moreover, "an available technology not on the market during the infringement can constitute a noninfringing alternative." *Slimfold Mnfg. Co.*, 932 F.2d 1453. The evidence at trial showed that making a non-infringing coupler would require only removing the "sealing surface" and changing the angle of the thread so that it is not "approximately perpendicular." Mr. Minemyer himself testified that the technology was available during the time period of the alleged infringement for these alterations. Thus, a non-infringing substitute could have been made. In sum, as Plaintiff failed to prove any lack of acceptable, non-infringing alternative couplers, he is not entitled to an award of lost profits.

    **D.**    **Plaintiff Failed To Prove His Manufacturing and Marketing Capabilities To Exploit Any Demand**

On the last Panduit factor, the evidence is again insufficient to support a jury award of lost profits because Plaintiff has failed to prove that he had the manufacturing and marketing capabilities to exploit any demand for the Lozon coupler. Mr. Degen opines that because Plaintiff was able to meet the market demand in the past, he could do so again. "This evidence adds vague estimation and gross extrapolation to unsupported presumption. At every step, this damages calculation is fraught with speculation." Oiness v. Walgreen Company, 88 F.3d 1025, 1029 (Fed. Cir. 1996).

Degen's conclusory presumption, ignores the substantial evidence that Plaintiff not only failed to meet market demand in the past without the aid of Defendants, but that he would be unable to do so in the future. Mr. Minemyer simply lacked the capital and capacity necessary to meet any significant market demand on his own in 2006 or the capacity to service and sell the couplers into the field to customers. This was shown by evidence of late deliveries, few employees or other resources, and lack of capital to change his molds to either begin working with Verizon (thus the $40,000 loan from R-Boc) or to change the mismarked patent number on his coupler. Thus, Mr. Degen's reliance on Plaintiff's past performance in supposedly meeting market demand improperly ignored the economic reality--that the only way Plaintiff was able to meet the past manufacturing, service and marketing requirements was through the financial aid of R-Boc.

Degen's testimony was completely void of any opinion about Plaintiff's marketing capabilities to meet any demand. Importantly, Mr. Grimsley testified that once Dura-Line won the Verizon RFP for couplers and caps, the work was not over. Winning the bid simply meant that Dura-Line was an approved vendor. A marketing team of over 40 reps was required to turn the small victory into real sales. Mr. Grimsley further testified as to what it would take to meet the demands of the customer through field service in 50 states. In contrast, Mr. Minemyer was

aided, at times, by a single marketing consultant, Mark Maynard. Degen simply did not take this factor into account but instead assumed that once the Verizon bid was won, the hard work was over. Likewise, Mr. Grimsley testified to Dura-Line's ISO certification, the minority content Dura-Line offered through R-BOC, and its decades-long history with the end users. The record is completely devoid of any similar evidence as to Mr. Minemyer's capabilities to meet this market demand. As such, Plaintiff failed to meet his burden of proving his ability to meet market demands and thus, his entitlement to any lost profits.

The Court should grant JMOL in favor of Defendants on the issue of damages, finding that Plaintiff is not entitled to lost profits. Most compelling, Plaintiff's expert, Mr. Degen, based his entire lost profits analysis on unreliable, inaccurate, and inconsistent data, which cannot support an award of lost profits. Plaintiff wholly failed to meet the Panduit criteria advanced by his own expert and thus, cannot recover any lost profits.

Respectfully submitted,

Dated: February 16, 2012      /s/ Matthew G. McAndrews
                              Matthew G. McAndrews
                              Frederick C. Laney
                              Niro, Haller & Niro
                              181 W. Madison Suite 4600
                              Chicago, Illinois 60602

                              (312) 236-0733

                              Facsimile: (312) 236-3137

                              E-mail: mmcandrews@nshn.com

                              E-mail: laney@nshn.com


                              *Attorneys for Defendants*

                              R-BOC Representatives, Inc., Carolyn Lundeen, Robert
                              Lundeen, Precision Custom Molders, Inc., Edward

Krajecki, Sandra Krajecki, LeBac Plastic Mold Co., Inc.,
and Ronald Backman

/s/ Natalie J. Spears
Natalie J. Spears
SNR Denton US LLP
7800 Sears Tower
233 South Wacker drive
Chicago, Illinois 60606
Phone: (312) 876-8000
Facsimile: (312) 876-7934
E-mail: nspears@snrdenton.com

Teresa A. Ascencio, Esq.
SNR Denton US LLP
4520 Main Street, Suite 1100
Kansas City, Missouri 64111
Phone: (816) 460-2400
E-mail: tascencio@snrdenton.com

*Attorneys for Defendants*

Dura-Line Corporation and Timothy A. Grimsley
## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on February 16, 2012, I electronically filed the preceding **DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW ON DAMAGES** with the Clerk of Court using the CM/ECF system which will send notification of such filings to the following:

| | |
|---|---|
| Sean B. Crotty | Douglas M. Chalmers, Esq. |
| The Coleman Law Firm | Law Offices of Douglas M. Chalmers |
| 77 West Wacker Drive | 77 West Wacker Drive |
| The Chambers, Suite 4800 | Chicago, Illinois 60601 |
| Chicago, IL 60601 | Phone: (312) 606-8700 |
| Phone: 312-444-1000 | Fax: (312) 444-1028 |
| Fax: 312-444-10258 | E-mail: dmc@chalmers-law.com |
| SCrotty@colemanlawfirm.com | |

### Attorneys for Plaintiff, John T. ("Tom") Minemyer

Matthew G. McAndrews
Frederick C. Laney
Niro, Haller & Niro
181 W. Madison Suite 4600
Chicago, Illinois 60602
(312) 236-0733
Facsimile: (312) 236-3137

E-mail: mmcandrews@nshn.com
E-mail: laney@nshn.com

**Attorneys for Defendants R-BOC Representatives, Inc., Carolyn Lundeen, Robert Lundeen, Precision Custom Molders, Inc., Edward Krajecki, Sandra Krajecki, LeBac Plastic Mold Co., Inc., and Ronald Backman**

/s/ Natalie J. Spears