# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **JOHN T. ("TOM") MINEMYER**, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **No. 07 C 1763** |
| **v.** | ) | |
| | ) | **Magistrate Judge Jeffrey Cole** |
| **R-BOC REPRESENTATIVES, INC., et al.** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

Prior to the jury's verdict in this case, the defendants moved for judgment as a matter of law on four points: infringement, indirect infringement, willful infringement, and damages. The case went to the jury under Fed.R.Civ.P. 50(b), and the defendants have renewed that motion. Rule 50 authorizes the entry of judgment as a matter of law if "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed.R.Civ.P. 50(a)(1). "'In other words, the question is simply whether the evidence as a whole, when combined with all reasonable inferences permissibly drawn from that evidence, is sufficient to allow a reasonable jury to find in favor of the plaintiff.'" *Khan v. Bland*, 630 F.3d 519, 523 (7th Cir. 2010). Because the plaintiff prevailed at trial, we construe the facts strictly in his favor. Although the court examines the evidence to determine whether the jury's verdict was based on that evidence, the court does not make credibility determinations or weigh the evidence. *Whitehead v. Bond,* _F.3d_, 2012 WL 1813683, 5 (7th Cir. 2012). It is the defendants' burden to show that no reasonable jury could have found for plaintiff even when the evidence is viewed in a light most favorable to him. *Denius v. Dunlap*, 330 F.3d 919, 927-28 (7th Cir. 2003).

## I.

## INFRINGEMENT
### A.

Defendants argue that plaintiff did not meet his burden of proof with respect to infringement, failing to present any evidence that the functional, "generally fluid tight seal" element of claims 2, 3, and 4 of the '726 patent is present in the accused B & C couplers. They submit that plaintiff's technical expert witness, Steven Kaiser, admitted that he didn't know whether the alleged sealing surface of the B & C coupler operated to form a generally fluid tight seal. Further, they argue that plaintiff introduced only conclusory expert testimony concerning whether the angle formed by the rear face of the thread of the B & C coupler is "approximately perpendicular" so as to satisfy a necessary element of claim 12. Defendants add that plaintiff also failed to present any relevant evidence establishing that seventeen of the nineteen different models of B & C couplers include each and every element of the asserted claims of the '726 patent as is required to prove infringement.

Defendants begin with the element of a "fluid tight seal" and argue that plaintiff failed to prove that the accused B & C coupler's alleged sealing surface, which is a flat surface between the inner threads of the coupler and an interior protruding stop in the center of the coupler, "cooperate[d] with an exterior surface of the first conduit to form a generally fluid tight seal therebetween." They point to a portion of testimony from plaintiff's expert, Steven Kaiser, which begins with a discussion of this sealing element of the '726 patent. (Dkt. # 478-2, Trial Trans., at 357-59). Mr. Kaiser explained that the patent discloses a "self-tapping" feature, meaning "a thread is created by the part [i.e. the threaded coupler] itself." Defense counsel's questioning went on from there:

> Q. Sharp point 69 of tooth 62 cuts exterior diameter 51 of conduit 34. Is that to say that the sharp teeth of the threads cut the exterior diameter of the conduit or the pipe?
>
> A. Yes.

2

Q. As it's being threaded on?

A. Correct.

Q. And creates the threaded profile or grooves 63 upon exterior perimeter during installation of female connector 40 upon the conduit 34. So that's to say that the threads and the sharp points with the self-tapping characteristics are cutting grooves into the exterior of the conduit, yes?

A. Yes.

(Dkt. # 478-2, at 358).  Counsel then moved on to the sealing surface language from claim 2 of the '726 patent:

Q: . . . The conduit coupling of claim 1, further comprising a sealing surface disposed between the threaded portion and the protrusion, and, the sealing surface operable to cooperate with an exterior surface of the first conduit to form a generally fluid tight seal therebetween. So the generally fluid tight seal therebetween is talking about the space between the sealing surface and the exterior of the conduit; is that right?

A. That would form a seal, yes.

(Dkt. # 478-2, at 358-59).

Defendants argue that this amounted to an acknowledgment from Mr. Kaiser "that the sharp threads on the [accused] B & C couplers cut grooves into the exterior of the conduit, which defendants submit *obviously* would prevent a fluid tight seal from forming between the flat surface and the grooved exterior surface of the conduit."  (*Defendants' Renewed and Consolidated Motion for JMOL* ("*JMOL*"), at 6)(emphasis in original).  The only thing obvious about the argument is that it is flawed.  First, it was never an issue in this case whether the Lozon coupler had a self-tapping feature that made grooves on the outside of the conduit as it was screwed onto it.  Nor was it ever disputed that the coupler was water tight.  Indeed, these facts were conceded.  Thus, Mr. Kaiser's acknowledgment of the fact that the coupler had a self-tapping feature that resulted in grooves is of

3

no help to the defendants' theory of the case.

Second, Mr. Kaiser never conceded either in his discussion about the patent or in his discussion about the coupler, itself, that the grooves prevented a water tight seal – the point now claimed to be "obvious."  Apart from Mr. Kaiser's testimony, the evidence was undisputed that the Lozon coupler and the B & C coupler were water tight.  Yet both had grooves in the conduits onto which they were screwed.  *Obviously* then, the grooves on the outer surface of the conduit did not prevent a water tight seal.  Thus, no part of Mr. Kaiser's testimony supports the defendants' "submi[ssion that the grooves] *obviously* would prevent a fluid tight seal from forming between the flat surface and the grooved exterior surface of the conduit."  (JMOL at 3).

Third, apart from the fact that the defendants' contention is hopelessly at odds with the undisputed evidence, there is nothing "obvious" about the matter.  Patent cases almost invariably involve matters of complexity that require expert elucidation.  They seldom, if ever, involve matters of indisputable obviousness.  This case was no exception.

The defendants further insist that Mr. Kaiser "was forced on cross-examination to concede he does not know whether the grooves cut in the exterior of the conduit prevent there from being a fluid type seal." (JMOL, at 7).  This conclusion is based on an excerpt from the transcript, which the motion quotes thusly:

> Q. Now, in preparing your analysis you didn't do any testing at all to confirm that there's a generally fluid tight seal between the sealing land and the exterior of the conduit, did you?
>
> A. We did not have that method of testing.
>
> Q. You didn't do any pressure testing?
>
> A. I did not.

> Q. With air?
>
> A. No.
>
> Q. You didn't do any water testing?
>
> A. No.
>
> Q. Or gas testing?
>
> A. No, we don't have that type of equipment.
>
> Q. So you don't know whether or not *as you sit here now* the grooves of the channels that are cut in the exterior of the conduit prevent there from being a generally fluid tight seal between the exterior of the conduit with the channels cut in it and the sealing surface, do you?
>
> A. I would not know that.

(Motion, at 7)(Emphasis supplied).

The problem is that the Motion has altered and misquoted the transcript.   Here is what the

defendants' lawyer actually asked at trial:

> Q. So you don't know whether or not*, as you sit here*, *how* the grooves of the channels that are cut in the exterior of the conduit prevent there from being a generally fluid tight seal between the exterior of the conduit with the channels cut in it and the sealing surface, do you?
>
> A. I would not know that.

(Dkt. # 478-2, at 359-60)(Emphasis supplied).

 In the trial transcript, commas set off the phrase ",as you sit here,"and the phrase, ",as you

sit here," is followed by the word "how" – not "now" as the defendants' Motion reflects.   The

alteration could scarcely be more significant.   It is apparent that the cross-examiner had intended to

ask Mr. Kaiser if he had a present opinion – ",as you sit here," – whether the serrated surface

prevented there being a water tight seal.   He obviously changed his mind mid-question (perhaps

fearing the answer) and completed the thought by assuming that the grooves did prevent a water tight seal. Hence, the word "how" immediately follows ", as you sit here,". In short, the question as asked was not whether, in Mr. Kaiser's opinion, the grooves cut in the exterior surface of the conduit precluded a water tight seal, but rather "how" there could be a water tight seal in light of the serrated surface of the conduit resulting from the coupler's self-taping feature. The question as asked thus subtly assumed a critical fact not in evidence, and Mr. Kaiser, taking the question as subtly posed said he would not know "how" that would happen. Gottcha. Once the awkwardly phrased question as actually asked is altered in the Motion, the defendants can comfortably (but incorrectly) say that Mr. Kaiser was forced to concede on cross-examination that he "does not know whether the grooves cut in the exterior of the conduit prevent there from being a fluid tight seal." (Motion at 7).

Whether this revision of the transcript was intentional need not be decided. If it was purposeful, disturbing questions about the way in which the Motion was prepared are raised. *See Correa v. Hospital San Francisco*, 69 F.3d 1184, 1192, 1197 (1st Cir. 1995); *Pinkham v. Sara Lee Corp*, 983 F.2d 824, 833 (8th Cir. 1992); *Cox v. CFTC*, 138 F.3d 268, 275 (7th Cir. 1998); *United States v. Pacelli*, 491 F.2d 1108, 1120 (2nd Cir. 1974). But whether intentional or inadvertent, what was done was "quite misleading." *Walters v. National Association of Radiation Survivors*, 473 U.S. 305, 322 (1985).

Of course, the plaintiff, not the defendants, had the burden of proof at trial, and it is his position that there is sufficient evidence that the grooves on the exterior surface of the conduct made as the coupler screws onto the conduit, do not prevent a fluid tight seal and that the sealing land did cooperate to create the seal. Mr. Kaiser's testimony was not the only evidence presented at trial.

As the plaintiff points out, defendants, Lundeen and Grimsley, conceded in their testimony that both the accused B & C coupler and plaintiff's coupler, the Lozon coupler, had air and water tight seals. (*Plaintiff's Appendix*, Trial Trans., at 525, 797-99, 1100-01, 1282, 1320, 1344-45, 1394-95). Indeed, there was no evidence offered by anyone to the contrary on this point. In fact, the evidence was overwhelming as well as uncontradicted that both sets of couplers were water tight and that there were no complaints to the contrary from any customer. Moreover, it was conceded that defendants advertised the B & C coupler as providing a water and air tight connection. (*Plaintiff's Appendix*, PX 56). Defendant Dura-Line bid its B & C coupler as being air and water tight. (*Plaintiff's Appendix*, PX 56). Defendants also said in bids and proposals that *all* the couplers they handled – including B & C and Lozon couplers – were tested to be airtight and water tight. (*Plaintiff's Appendix*, PX 47, at 56). And, they admitted that there had never been a complaint about water leakage in the field.

So, the defendants themselves don't think that a self-tapping feature precludes a fluid tight seal, and the undisputed evidence from both sides was that it did not. It was reasonable for the jury to conclude from this evidence that the B & C coupler had a fluid tight seal just as did the Lozon coupler. Given the unchallenged evidence in the case from both sides, it is an irrelevant quibble to note that Mr. Kaiser did not fluid test the coupler he examined or any of the other B & C couplers. The question of whether either the Lozon coupler or the B & C coupler had a fluid tight seal, was simply not open to debate Certainly, from the overwhelming, undisputed evidence in the case, the jury could reasonably conclude that, both the B & C couplers and the plaintiff's couplers had fluid

tight seals.[1]

Defendants refer to evidence that shows that while the overall device may be fluid tight, it is not the result of the cooperating sealing surface and the exterior of the conduit as the patent requires. Defendant Lundeen explained that his B & C couplers were, indeed, fluid tight, but not because of the sealing surface:

> The sealing surface adds no value. In fact, the sealing surface . . .
>
> *        *        *
>
> When you screw in a conduit, you're –  the threads are putting grooves into the conduit. And when you get to the landing surface, the threads are still there. And so any air, gas, or water that gets to the sealing surface is going to get through those grooves. So it really isn't a sealing surface.

(*Plaintiff's Appendix*, Trial Trans., at 990-91).   Mr. Lundeen also explained that this was why the

---

[1] In their reply brief, the defendants argue that there is no evidence that the sealing surface of the B & C coupler performs the function of creating a fluid tight seal.  While there were hints of the argument in the Motion (*id*. at 3-7), they were in the context of other arguments and the hints were not fully developed and their apparent import was masked by other arguments in which they were contained.  It was not until the reply brief that it was clear that the defendants had in mind and thus the plaintiff did not have a fully adequate opportunity to respond.  Waiting until the reply brief to raise or adequately develop an argument is improper and can result in a waiver.  *See Clarett v. Roberts*, 657 F.3d 664, 674 (7th Cir. 2011)(argument addressed in two sentences deemed waived); *Parker v. Franklin County Community School Corp*., 667 F.3d 910, 924 (7th Cir. 2012)(four-sentence argument deemed waived); *Boadenstab v. County of Cook*, 569 F.3d 651, 658 (7th Cir. 2009)(arguments not developed until reply brief deemed waived).

Defendants' discussion of the cooperating surfaces language focused on the self-tapping feature and the grooves being cut into the outer surface of the inner conduit and how that prevents a fluid tight seal from being achieved. (*JMOL*, at 5-7).  They did not argue that the self-tapping feature meant that the surfaces were not "cooperating." (*JMOL*, at 7).  Oddly, in their reply brief, the defendants first contend that it is *irrelevant* whether the B & C coupler is fluid tight as a whole (*JMOL Reply*, at 6), despite the fact that their main argument in their opening brief was that there was no evidence that the B & C coupler could be fluid tight despite the self-tapping feature.  (*JMOL*, at 5-7).  Also, it's unclear and left unexplained by defendants what might account for the B & C coupler's fluid tight seal if not the fit between the outer surface of the conduit and the interior, sealing surface of the second conduit.

But no objection on this score has been offered by the plaintiff, and there was no request for leave to file a sur-reply or to strike the reply.  Hence, any waiver argument that might have been raised is itself waived.  *Nunez v. United States*, 546 F.3d 450, 452 (7th Cir. 2008).

defendants made changes to their product in early 2008. They took out the smooth surface – the sealing land – before the stop and brought the threads all the way to the stop. He testified there were two reasons for the change:

> The first reason is the stop added no value because it really didn't seal.
>
> And if you look at it – if you screw in a piece of conduit, it's going to thread the conduit on the outside. And when it gets to the smooth surface, it's still going to have the grooves that the screws put into it, or the threads, and so the air will come out of it where the smooth surface is. So we eliminated that.
>
> And it also, by putting more threads on there, we increased the pull-out:

(*Plaintiff's Appendix*, Trial Trans., at 990).

So, basically, while Mr. Lundeen agreed that there was a fluid tight seal (*Plaintiff's Appendix*, Trial Trans., at 797), in his opinion, it was not because of the sealing surface or "seal-land." (*Plaintiff's Appendix*, Trial Trans., at 799). That's certainly evidence to support the defendants' position – if the jury chose to credit it; but it was for the jury to decide whom to belief. "[E]very judge is aware that many people...will lie in a trial when it is to their advantage. "*Schmude v. Tricam Industries, Inc.*, 556 F.3d 624, 628 (7th Cir. 2009), and a jury "may disbelieve or reject any evidence." *Branion v. Gramly,* 855 F.2d 1256, 1263 (7th Cir. 1988). *See also Whitehead v. Bond*, __F.3d__, 2012 WL 1813683, 5 (7th Cir. 2012). The jury was thus free to accept Mr. Kaiser's testimony and that of Mr. Minemyer and reject the testimony of Mr. Lundeen. *Verizon Services Corp. v. Cox Fibernet Virginia, Inc.*, 602 F.3d 1325, 1341 (Fed.Cir. 2010). In this case, the jury was instructed that they were the sole and exclusive judges of the facts and the credibility of the witnesses, and that they could consider the witness' interest in the outcome of the case in determining credibility.

Defendants also argue that Mr. Kaiser's expert testimony that the B & C coupler's sealing surface cooperated with an exterior surface of the conduit to form a generally fluid tight seal was conclusory. (*JMOL*, at 4-5). They don't specify any particular testimony they feel was conclusory, but they liken Mr. Kaiser to the expert in *Yoon Ja Kim v. ConAgra Foods, Inc*., 465 F.3d 1312 (Fed.Cir. 2006). But the expert in *Yoon Ja Kim* – who happened to be the patent holder – offered testimony about the accused product without ever having examined it. 465 F.3d at 1320. The court held that the patent holder "did not prove infringement because she presented no testimony based on the accused products themselves that supported a finding of infringement." 465 F.3d at 1320. Mr. Kaiser, conversely, did examine the accused couplers. And, again, his testimony was far from the only evidence that the B & C couplers had fluid tight seals.[2]

## B.

Defendants next argue that the plaintiff failed to present any evidence of infringement for sixteen of the eighteen accused products.[3] They point to Mr. Kaiser's testimony in which he concedes that he only examined two sizes of B & C couplers. (Dkt. # 478-2, at 354-56, 379). According to the plaintiffs, Mr. Kaiser was hamstrung by the defendants' failure to produce the other sizes in discovery. (*Plaintiff's Response*, at 4). The defendants do not seriously dispute this.[4]

---

[2] The other two cases defendants cite are similarly inapplicable here. *See Krippelz v. Ford Motor Co.*, 667 F.3d 1261, 1260 (Fed.Cir. 2012)(expert added a limitation that was not in the disclosure); *Sitrick v. Dreamworks*, 516 F.3d 993, 1001 (Fed.Cir. 2008)(expert admitted unfamiliarity with the particular art at issue and his opinion was unsupported by any information).

[3] Defendants initially argue that it is seventeen of nineteen, but concede in their reply brief that this was their error. (*JMOL Reply*, at 8 n.5).

[4] Defendants attach pictures of five different colored couplers to their reply brief and submit that these are different sized couplers that defendants gave to plaintiff at plaintiff's counsel's office. (*JMOL Reply*, Ex. (continued...)

Different size couplers, of course, would use different size molds. (Dkt. # 478-2, at 371-73).

Mr. Kaiser said that there were thirteen manufacturing factors that could affect the final measurements of the parts from the molds. (Dkt. # 478-2, at 347). So, according to the defendants, even if the different sized molds were the same, the final products from those molds might differ, and thus, the jury could not have found that these unexamined sizes infringed every element of claims 2, 3, 4, and 12. Plaintiff again points out that there was more evidence at trial than testimony from Mr. Kaiser. Defendant Krajecki testified that every size coupler he made for B & C had the exact same type of thread. (*Plaintiff's Appendix*, Trial Trans., at 674-75). Mrs. Lundeen testified that the B & C coupler sizes were the same as the various Lozon coupler sizes. (*Plaintiff's Appendix*, Trial Trans., at 539). Mr. Backman, the man whom defendants hired to make their molds, testified that defendant Krajecki asked him to make molds in order to duplicate exactly a number of different-sized Lozon couplers. (*Plaintiff's Appendix*, Trial Trans., at 700-701). Mr. Kaiser said that the other sized molds shared the same characteristics. (*Plaintiff's Appendix*, Trial Trans., at 376-77). Indeed, Mr. Backman, the expert mold-maker, bragged that when he made molds, he allowed for a very slight degree of variance. (*Plaintiff's Appendix*, Trial Trans., at 736). Defendant Lundeen testified that he gave Mr. Krajecki a Lozon coupler "[s]o he could see what we like to make." (*Plaintiff's Appendix*, Trial Trans., at 828). Defendant Grimsley admitted that, prior to the re-design in about 2008, the B & C coupler had the purportedly infringing sealing surface and thread design. (*Plaintiff's Appendix*, Trial Trans., at 1428-1432). Plaintiff argues that "the combination of defense admissions and evidence of copying amply supports the jury's conclusion that all sizes

---

[4](...continued)
2). There is no way to tell from the photos where they were taken or that the couplers were different sizes. Of course, this is no proof that a few different-sized couplers were actually produced in discovery, and it certainly doesn't show that defendants produced all eighteen sizes they are complaining about now.

of the B & C coupler infringed the patent in the same way as the two examined by Mr. Kaiser." (*Plaintiff's Response to JMOL*, at 5-6).

While the argument is poorly phrased, the substance of the argument is sound. It cannot be too strongly stressed that this is not a case where infringement is sought to be proved by showing that the defendant copied a patented product, *simpliciter*, and from the act of copying alone the jury is asked to find infringement. That, of course, would be improper since evidence of copying is "'of no import on the question of whether the claims of an issued patent are infringed . . . .'" *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1336 (Fed.Cir. 2009).

The instant case stands in stark contrast to the situation envisioned in those cases in which the Federal Circuit has held that copying, alone, is not evidence of infringement. The defendants have carefully put out of view the context in which the limitation on the relevance of "copying" have been announced by the Federal Circuit, even though statements in judicial opinion must be considered in the context of their utterance. *See United States v. Apfelbaum,* 445 U.S. 115, 120 n. 6 (1980); *Monell v. Dept. of Social Services of New York City,* 436 U.S. 658, 696 (1978); *Penry v. Lynaugh,* 492 U.S. 302, 358 (1989) (Scalia, J., concurring and dissenting in part) ("One must read cases, however, not in a vacuum, but in light of their facts...."). "[I]t is a disservice to judges and a misunderstanding of the judicial process to wrench general language in an opinion out of context." *Aurora Loan Services, Inc. v. Craddieth,* 442 F.3d 1018 (7th Cir. 2006).

Here, the plaintiff proved that the defendants infringed claims 2, 3, 4, and 12 of his patent through the testimony of Mr. Kaiser, among others. He then demonstrated that the defendants reproduced in various sizes the coupler that independent proof had already shown had been infringed upon by the defendants. That is plainly not the situation the Federal Circuit considered in those

cases in which it has announced the limitation on evidence of copying. Not surprisingly, the defendants have offered not a single case remotely comparable to the situation that obtains here, namely where the proof, independent of copying, shows infringement and the evidence is that the infringing device was simply reproduced in different sizes.

Thus, the evidence of copying here was not offered or received to show that "they copied, therefore they infringed." It was, instead, offered for the limited purpose of showing willfulness and the jury was so instructed. There were two B & C couplers offered for comparison with the patent claims. The defendants do not argue here that there was no evidence that these two couplers infringed the patent. (*JMOL*, at 7-11). The jury could conclude that the molds for the various sized couplers replicated the patented features of the molds for the infringing products and differed only in that they produced different sized couplers. That would lead to the further conclusion that the replicas (save for their diameter) of the products proven independently to infringe infringed as well.

The jury was presented with evidence that thirteen factors could alter some of these characteristics to some degree – perhaps *de minimus*, perhaps not. But these were matters for the jury to consider in assessing whether the sixteen couplers that were not examined by Mr. Kaiser also infringed. The jury was free to conclude that there might be material variances. And if they did, they could conclude that infringement had not been proved as to those couplers Mr. Kaiser had not examined. They were equally free, however, to reject the defendants' speculative theory. Given all the evidence, it was not a great analytical leap for the jury to conclude that the reproductions in different sizes of couplers Mr. Kaiser did, in fact, examine and found infringing, were likewise infringing. *See Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1326 (Fed.Cir. 2009); *Lucent Technologies, Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1319 (Fed.Cir. 2009). Indeed, in the context

13

of this case, the defendants' argument is contrary to common sense and would lead to an unsound result. *Compare Minkin v. Gibbons, P.C.,* 2012 WL 1560406, 10 (Fed.Cir. 2012)("The district court...call[ed] this Minkin argument 'weak,' 'unsupported,' and 'contrary to common sense.'...We agree.");*Stone Strong, LLC v. Del Zotto Products of Florida, Inc*., 455 Fed.Appx. 964, 969, 2011 WL 4913415, 5 (Fed. Cir. 2011)("'Rigid preventative rules that deny fact finders recourse to common sense... are neither necessary under our case law nor consistent with it.'").

Defendants also argue in their reply brief that the only evidence plaintiff points to in his response brief concerns the thread of the devices, but says nothing about the other elements of the claims. (*JMOL Reply*, at 10). The defendants submit that there is no evidence that the B & C couplers infringed any of the other elements of the claims. But Mr. Kaiser testified at length as to the infringement of element after element of the claims. (*Plaintiff's Appendix*, Trial Trans., at 324 *et seq.*). Defendants do not share with the court what elements they think he might have missed. Without some hint from defendant, one can only guess what elements they have in mind. Inviting speculation is not the same as meeting the burden of demonstrating that no reasonable jury could have found for plaintiff even when the evidence is viewed in a light most favorable to him. *Denius*, 330 F.3d at 927-28; *Bruso,* 239 F.3d at 857.

## C.

Defendants next focus on claim 12, which discloses a thread with a "rear face disposed approximately perpendicular to a longitudinal axis through the base of the first thread." They contend that the "Court has construed 'approximately perpendicular' to mean 'approximately 90 degrees.'" (*JMOL*, at 11-12). Given the history of the proceedings in this case, it is mystifying how

14

the defendants could have made such a misstatement.  In brief, the opinion in *Minemyer v. R-Boc Representatives, Inc.*, 2011 WL 1099265 (N.D.Ill. Mar. 22, 2011) explains in detail how the plaintiff and the defendants waived a *Markman* hearing because they had agreed that the claim term "approximately perpendicular" meant approximately 90 degrees.

In denying the motion for summary judgment  the opinion noted:

> Essentially, they [the defendants] base their argument on evidence that "approximately ninety degrees" must be limited to no further than five degrees from perpendicular and evidence that their coupler's threads are at eighty degrees—or ten degrees off perpendicular. But it is a tardy argument that confuses the phase of the case where the claim is construed—which defendants agree is over—with the phase of the case where the issue of infringement is resolved by the trier of fact. Moreover, even if defendants were in the right phase of the case at the right time, their evidence—most notably the testimony of the plaintiff and a snippet of prosecution history—would not entitle them to summary judgment on the issue of claim construction. As it stands, this is nothing more than a back-door attempt to have a Markman hearing that the defendants already agreed was unnecessary and renege on their agreement as to the construction of claim 12 and its accompanying jury instruction.

> \*   \*   \*

> Almost invariably, the court's claim construction will be set out in the jury instructions. The claim construction is most often derived through a Markman hearing, although sometimes, as here, the parties will agree on claim construction and the accompanying jury instruction. In either case, once the claims are construed, it's too late to argue about the meaning of the claims, as the defendants have done repeatedly in their motion

*Minemyer v. B-Roc Representatives, Inc*., 2011 WL 1099265, 3 (N.D.Ill. 2011).

The opinion went on to note that defendants' proposed jury instruction on claim 12 – the wording of which plaintiff accepted – is that the phrase 'the rear face disposed approximately perpendicular to a longitudinal axis through the base of the first thread' means the surface of each tooth facing away from the first end of the first connector is at *an approximately ninety degree angle* to the base of the tooth.'"(emphasis supplied).  The opinion further noted that the defendants

15

belatedly, and in contravention of their agreement with the plaintiff and their representations to Judge Coar, sought to effectively abandon their agreement and have an untimely *Markman* hearing. *Minemyer*, 2011 WL 1099265, 1-3. To now suggest that the construction was not a product of their own devising but that of the court is false, at the very least.

In any event, the defendants' argument is that the plaintiff did not present sufficient evidence that "approximately 90 degrees" includes angles up to, and including, 80 degrees. (*JMOL*, at 11-12). The argument is not persuasive. At trial, Mr. Kaiser, who was schooled in the art, and thus was competent to know what approximately perpendicular included, testified that the accused B & C couplers did, indeed, have threads with angles of approximately 90 degrees:

> Q. Okay. Here's the good one, the rear face disposed approximately perpendicular to a longitudinal axis through the base of the first thread. You see that?
>
> A. Yes.
>
> Q. Did the B and C have that?
>
> A. Yes, it does.
>
> Q. Approximately 90-degree angle?
>
> A. Approximately.
>
> Q. Through the base of the tooth?
>
> A. Yes.
>
> Q. What was it?
>
> A. Measured, I believe, close to 80 degrees.

Q. So around 80?

A. I believe it was, yes.

*    *    *

Q. Any problems with that part, from what you could see?

A. It looks like it's very well made. All surfaces are smooth. It's like a good part.

Q. Any doubt that those teeth are approximately perpendicular?

A. Not in my mind, no.

(*Plaintiff's Appendix*, Trial Trans., at 336, 367).

So, Mr. Kaiser, who has 40 years of experience in injection molding, and whose expertise in this area was unchallenged by the defendants, clearly said that the B & C couplers met the defendants' own construction of the patent's language. Defendants did not challenge that opinion before trial under *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993) or in their cross-examination at trial. They did not even touch on the topic of "approximately perpendicular" or "approximately 90 degrees." (*Plaintiff's Appendix*, Trial Trans., at 338-62). Yet now they contend that Mr. Kaiser's testimony is not evidence that a person of skill in injection molding would recognize "close to 80 degrees" as being "approximately 90 degrees."

Mr. Kaiser was accepted by both sides as a person skilled in the art of injection molding and there was no doubt in his mind that the close to 80 degree angles on the B & C couplers were approximately 90 degrees. As noted, there was no cross-examination on the subject, even though, as the Supreme Court explained in *Daubert ,* cross-examination is the "traditional and appropriate" method of attacking shaky expert testimony. 509 U.S. at 596. *See also i4i Ltd. Partnership v.*

17

*Microsoft Corp.*, 598 F.3d 831, 856 (Fed.Cir. 2010).

Defendants point to one piece of contrary evidence they presented, from their witness, Mr. Backman – who was a machinist. He testified that if someone asked him for "a part that's approximately 90 degrees," he would, in his judgment, only allow a one-half degree variance. (Trial Trans., at 736). But, of course, that was his personal view, and in any event the jury was free to reject Mr. Backman's opinion in favor of Mr. Kaiser's. *Verizon Services Corp. v. Cox Fibernet Virginia, Inc*., 602 F.3d 1325, 1341 (Fed.Cir. 2010); *Anderson v. Griffin*, 397 F.3d 515, 521 (7th Cir. 2005).[5]

It is true, as the defendants argue, that the Federal Circuit has said that "[a]n expert's unsupported conclusion on the ultimate issue of infringement will not alone create a genuine issue of material fact." *Intellectual Science and Technology, Inc. v. Sony Electronics, Inc*., 589 F.3d 1179, 1184 (Fed.Cir. 2009); *Arthur A. Collins, Inc. v. Northern Telecom Ltd.*, 216 F.3d 1042, 1046 (Fed.Cir. 2000). But although Mr. Kaiser's opinion embraced an ultimate issue – which is perfectly permissible, *see* Fed.R.Evid. 704 – it did not run afoul of Federal Circuit case law.

In *Intellectual Science*, the expert failed to pinpoint where the claimed elements at issue were found in the accused optical disc reader devices, 589 F.3 at 1184, while in *Arthur A. Collins,* the expert failed to adequately explain how the structure of a switch in the accused fiber optic

---

[5] Defendants also point to the plaintiff's deposition testimony used at trial where Mr. Minemyer stated that "once you start getting into 10 or 15 [degrees] that's significantly different" from "approximately perpendicular." (*JMOL*, at 14). But this is just one more piece of evidence for the jury to have weighed. Additionally, the Federal Circuit has held that inventor testimony is irrelevant to claim scope. *Howmedica Osteonics Corp. v. Wright Medical Technology, Inc*., 540 F.3d 1337, 1346-47 (Fed.Cir. 2008). "[I]t is not unusual for there to be a significant difference between what an inventor thinks his patented invention is and what the ultimate scope of the claims is . . . ." *Id.* This point was also made in this case in denying the defendants' motion for summary judgment. *See Minemyer*, 2011 WL 1099265, 5.

transmission equipment constituted the type of switch disclosed in the patent. 216 F.3d at 1046. There is nothing comparatively complicated here. A person skilled in the art opined that, in injection molding, an 80-degree thread angle would be considered approximately 90 degrees. What more explanation is required defendants do not say. Nor could they when asked during the 3 1/2-hour oral argument on their JMOL motion. Not surprisingly, Mr. Backman's opinion that only a half degree variance could pass muster was offered with no more explanation than was Mr. Kaiser's. For the defendants, Mr. Kaiser's opinion was unacceptable while Bachman's rigid assessment was to be accorded the weight of an encyclical.

Moreover "approximately" is, of course, a word of approximation, like "generally" or "substantially" or "about." *Anchor Wall Systems, Inc. v. Rockwood Retaining Walls, Inc*., 340 F.3d 1298, 1310-11 (Fed.Cir. 2003). "While ideally, all terms in a disputed claim would be definitively bounded and clear, such is rarely the case in the art of claim drafting." *Id.* at 1311. Such words of approximation are commonly used in patent claims to avoid a strict numerical boundary. *Id.* at 1310-11. They need not be construed with mathematical precision. *North American Container, Inc. v. Plastipak Packaging, Inc*., 415 F.3d 1335, 1346 (Fed.Cir. 2005); *Anchor Wall Sys.,* 340 F.3d at 1311. Defendants did not seek to impose a strict – indeed any – numerical boundary in the construction they espoused and which was ultimately accepted by the plaintiff and Judge Coar. The defendants made a tactical decision early on to define the claim term the way they did. Parties must live with the consequences of their strategic decisions. *Lynch, Inc. v. SamataMason Inc.*, 279 F.3d 487, 490-492 (7th Cir. 2002); *Novamedix, Ltd. v. NDM Acquisition Corp*., 166 F.3d 1177, 1183 (Fed. Cir.1999). The jury had sufficient evidence to draw the conclusion they did.

**II.**

19

## DAMAGES

Defendants' next objection, that the jury got the damages award wrong, is contingent on their position that there was no evidence that all of B & C's different-sized couplers infringed. But that argument has been rejected. The ancillary position is that the plaintiff failed to show that there were no available non-infringing alternatives to his coupler and, therefore, he was not entitled to an award of lost profits. (*JMOL*, at 16-17).

In order to receive lost profits, a plaintiff must establish the absence of acceptable noninfringing substitutes. *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1329 (Fed.Cir. 2009). Here, the plaintiff reminds us that the defendants bought, bid, and sold Lozon couplers for a very long time and with great success to Verizon and to other highly sophisticated consumers. If there were acceptable substitutes – especially given the price of the plaintiff's products – defendants would have bought, bid, and sold them. The undisputed evidence was that Verizon paid a 50% premium for Lozon couplers over competing products. In other words, even if there were acceptable substitutes, the defendants ignored them. Consequently, defendants' "acceptable substitute argument must be viewed of limited influence." *TWM Mfg. Co., Inc. v. Dura Corp.*, 789 F.2d 895, 902 (Fed.Cir. 1986); *Scripto-Tokai Corp. v. Gillette Co.*, 788 F.Supp. 439, 445 (C.D.Cal. 1992).

There was evidence from which the jury could conclude that when DuraLine was bidding, Verizon perceived that DuraLine's bid of Lozon couplers was the main advantage to its bid. (*Plaintiff's Appendix*, PX 40; Trial Trans., at 1503, 1508-13, 1620, 1904). *See Minemyer v. R-Boc Representatives, Inc.*, _F.Supp.2d_, 2012 WL 512397 (N.D.Ill. 2012). Moreover, the fact that there was overwhelming evidence at trial that the defendants copied the plaintiff's coupler is still another

indication of the absence of acceptable substitutes. *AMP Inc. v. Lantrans, Inc.*, 1991 WL 253796, *7 (C.D.Cal. 1991)(citing, *TWM,* 789 F.2d at 900). Defendants don't respond to this argument in their reply brief (*JMOL Reply*, at 13-14). In this Circuit, failure to respond to an argument implies concession and generally results in a waiver of the point. *Milam v. Dominick's Finer Foods, Inc.,* 567 F.3d 830, 832 (7th Cir.2009); *MindGames, Inc. v. Western Pub. Co., Inc,*. 218 F.3d 652, 659 (7th Cir.2000); *MCI WorldCom Network Services, Inc. v. Atlas Excavating, Inc.,* 2006 WL 3542332 at *3 (N.D.Ill. 2006); *Drummer v. Bank,* 2006 WL 2051331 at *5 (N.D.Ill.2006).

Judgment as a matter of law on damages is inappropriate.

### III.
### WILLFUL INFRINGEMENT

Defendants' next argument, that the plaintiff failed to establish willful infringement, has more traction than its other positions. It almost has to, given *In re Seagate Tech., LLC,* 497 F.3d 1360, 1371 (Fed.Cir.2007)(*en banc*). Under *Seagate*, to establish willful infringement, "a patentee must show by clear and convincing evidence that the infringer acted despite an objectively high likelihood that its actions constituted infringement of a valid patent." 497 F.3d at 1371. The Federal Circuit has said that this objective prong "tends not to be met where an accused infringer relies on a reasonable defense to a charge of infringement." *Advanced Fiber Technologies (AFT) Trust v. J & L Fiber Services, Inc*., 674 F.3d 1365, 1377 (Fed.Cir. 2012); *Spine Solutions, Inc. v. Medtronic Sofamor Danek USA, Inc.,* 620 F.3d 1305, 1319 (Fed.Cir.2010). Even in a case like this, where the jury could find that the evidence showed that the defendants embarked on a course of deliberate and clandestine copying of the patented device, it does not take much for the objective prong to rule the day and absolve a defendant of willful infringement. If the infringer's position is "susceptible to a

21

reasonable conclusion of no infringement," there can be no finding of willfulness regardless of blatant, deliberate copying. *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1310 (Fed. Cir. 2011).

Only if the patent holder presents clear and convincing evidence that satisfies the objective standard does the subjective standard come into play. *Powell v. Home Depot U.S.A., Inc.*, 663 F.3d 1221, 1236 (Fed.Cir. 2011). At that point, "the patentee must also demonstrate that this objectively-defined risk...was either known or so obvious that it should have been known to the accused infringer." *Seagate,* 497 F.3d at 1371. Blatant, deliberate, and slavish copying – the kind that the jury could find existed in this case – can prove to be irrelevant if the plaintiff does not make it to the second prong. *DePuy Spine, Inc.*, 567 F.3d at 1336. What is relevant under Federal Circuit precedent can include defenses that the infringers were completely unaware of at the time they set about copying the patented device. These are defenses that, for lack of a better phrase, existed nowhere but in the legal ether until defendants' attorneys plucked them from that ether years after the fact and presented them during the proceedings.

The *Seagate* standard, then, is somewhat counterintuitive and unwieldy to apply. *See Powell*, 663 F.3d at 1236 (discussing *Seagate*'s application in a trial setting). Even the Federal Circuit has struggled with the concept it created. For example, in June of 2009, the court ruled that evidence concerning "designing around" was relevant only to the infringer's mental state under *Seagate*'s second prong. *DePuy Spine*, 567 F.3d at 1337. Less than a year later, in March of 2010, the court apparently changed its mind and ruled that evidence concerning designing around was relevant to *both* the objective *and* subjective prongs of *Seagate*. *i4i Ltd. Partnership v. Microsoft Corp.*, 598 F.3d 831, 860 (Fed.Cir. 2010).

In this case, the defendants did present legitimate defenses to infringement at trial that, while unsuccessful, were at least "susceptible to a reasonable conclusion of no infringement." *Uniloc USA.*, 632 F.3d at 1310. That's all the Federal Circuit seems to require. *Cf. i4i Ltd.*, 598 F.3d at 860 ("Based on its own assessment of the evidence and Microsoft's defenses, the jury was free to decide for itself whether Microsoft reasonably believed there were any substantial defenses to a claim of infringement."). As already noted, there was a genuine issue for the jury as to whether the fluid tight seal was the product of the cooperation between the smooth sealing surface and the outer surface of the conduit. Just as the jury was free to accept plaintiff's evidence on this question, they were free to accept the defendants' contrary argument that the sealing land did not cooperate to contribute to the water tight seal. The fact that the jury found for the plaintiff does not mean, however, that the defense was not a credible one.

In addition, on the matter of the meaning of "approximately perpendicular," the jury was free to accept Mr. Kaiser's testimony or Mr. Backman's testimony. As already noted – and plaintiff agrees (*Response to JMOL*, at 6) – with a term of approximation, reasonable minds can differ, to an extent, where the cut-off is. The determination can be difficult. *Playtex Products, Inc. v. Procter & Gamble Co.*, 400 F.3d 901, 908 (Fed.Cir. 2005). That's not the stuff of a defense that is not susceptible to a reasonable conclusion of no infringement.

Then there is the defense of no infringement on the sixteen couplers that plaintiff's expert did not examine. Plaintiff's theory, which the jury chose to accept, was that infringement could be extrapolated from the undisputed evidence of reproduction in various sizes of the two couplers that Mr. Kaiser did examine and found were infringing. If the only thing different about the unexamined couplers was size, then they infringed as well. That was the theory, anyway, and it was accepted

23

by the jury. That is very different than simply saying, without more, that the 16 couplers of various sizes were copies of the Lozon coupler and therefore were without more infringing. The defendants' argument carefully puts out of view the fact that the two B & C couplers Mr. Kaiser examined did infringe. The only difference about the further reproductions was their size. Thus, the plaintiff's theory was not "the defendants copied my coupler, therefore they infringed my patent."

The defendants had another theory they advanced to the jury: one cannot tell wether the 16 untested couplers of varying sizes infringed because there were so many things could happen between the fabrication of the mold from which they came and the finished product. Since Mr. Kaiser had never examined any but two of the molds, the plaintiff failed to carry his burden of proving the other sized couplers also infringed his patent. Of course, the jury could have found this was nothing but a theoretical and speculative possibility especially since the mold maker, himself, negated the likelihood of significant variation. Speculation is not an appropriate basis for a jury to make factual determinations. *Engineered Products Co. v. Donaldson Co., Inc.*, 147 Fed.Appx. 979, 990, 2005 WL 2090662, 9 (Fed. Cir. 2005); *Oiness v. Walgreen Co.,* 88 F.3d 1025, 1033 (Fed. Cir.1996). The jury's rejection of the defendants' argument does not preclude it from being deemed a credible defense for purposes of the willfulness analysis. Because the defendants presented credible defenses to infringement of claims 2, 3, 4, and 12, a finding of willful infringement is inappropriate under Federal Circuit law.[6]

---

[6] Defendants also submit that they have presented "well-reasoned and legally and factually supported briefs setting forth the invalidity of asserted claims 2, 3, and 4." That's not quite accurate. In reality, the defendants raised their invalidity due to obviousness argument in their motion for summary judgment of invalidity in July of 2009. [Dkt. # 180, at 19-20]. The presentation was anything but legally supported – it *cited not a single case*, and it consisted of a few scant sentences and no analysis or explanation. Accordingly, under well-established Seventh Circuit precedent, the argument was deemed waived. [Dkt. # 252, at 20-21; #320, at 2]; *Mahaffey v. Ramos*, 588 F.3d 1142, 1146 (7th Cir. 2009)("Perfunctory, undeveloped arguments (continued...)

This is not to say that the plaintiff stood mute on the issue of willful infringement. But he relied, in the main, on evidence relevant only to the subjective prong of *Seagate*. He argues that defendants knew about the patent, that they copied the device, that they executed a bid and switch scheme, that they had no reason to believe they were not infringing, and that they failed to consult an attorney. (*Response to JMOL*, at 9). Knowing about the patent is the baseline for willful infringement under *Seagate*. Proceeding despite warnings would fall under the second, subjective prong – what is known to the infringer. It may be completely irrelevant if there are credible defenses to infringement that are not even a twinkle in a patent attorney's eye at the time the infringing occurs. All the warnings and threats in the world from an inventor are meaningless under *Seagate* if the infringer presents credible defenses at trial.

At trial the plaintiff amply proved that the defendants copied his coupler and engaged in a bid and switch scheme. But, that evidence does not go to *Seagate*'s objective prong – the first prong which must be satisfied before things like copying and schemes can be considered. But given the defendants' credible non-infringement defenses, which were susceptible to a reasonable conclusion

---

[6](...continued)
without discussion or citation to pertinent legal authority are waived."); *Davis v. Carter*, 452 F.3d 686, 691-92 (7th Cir. 2006)(same).

The defendants also mishandled their public use invalidity contention by missing a court-ordered deadline and violating 35 U.S.C. § 282. [Dkt. # 13-16; 320]; *Ferguson Beauregard/Logic Controls, Div. of Dover Resources, Inc.*, 350 F.3d 1327, 1347 (Fed.Cir. 2003). As such, it never became a part of this case. Defendants submit that waiver or lack of notice under 35 U.S.C. §282 must be ignored in the willful infringement analysis but, yet again, cite no case law to support their assertion. (*JMOL*, at 34). *Powell*, which the defendants inexplicable rely on, does not mention waiver or failed notice under 35 U.S.C. § 282. These public use and obviousness defenses were not so much failed defenses, but failed attempts at even mounting defenses. They ought not enter into the willfulness calculus. It takes more than cavalierly tossing out an undeveloped defense or raising one when it's too late to stave off a willfulness finding. *Cf. Bard Peripheral Vascular, Inc. v. W.L. Gore & Associates, Inc.*, 670 F.3d 1171, 1190 -1191 (Fed.Cir. 2012)(the mere presentation of several defenses does not mean a willfulness finding lacks a sufficient evidentiary basis); *i4i Ltd.*, 598 F.3d at 860 (same).

of non-infringement, *Uniloc USA.*, 632 F.3d at 1310, the jury's finding cannot stand under *Seagate* and its progeny. And sadly so given the defendants' egregious and clandestine copying of Mr. Minemyer's patent coupler and the dubious testimony Grimsley and the Lundeens gave at trial.

## IV.
## INDUCEMENT

Mr. Krajecki was found liable for having induced his company, Precision Custom Molders, to infringe as was Mr. Grimsley, who the jury found induced his employer, DuraLine to infringe the plaintiff's patent. The defendants submit that the evidence was insufficient to prove that either Mr. Grimsley or Mr. Krajecki had knowledge of the 726 patent and thus the jury could not have found Mr. Krajecki and Mr. Grimsley liable for inducement of infringement. Under Rule 50, the evidence must be viewed in a light most favorable to the verdict, *Global-Tech Appliances, Inc. v. SEB S.A.*, _U.S._, 131 S.Ct. 2060, 2071 (2011), and the district court must construe the facts strictly in favor of the party that prevailed at trial. *Schandelmeier v. Bartels v. Chicago Park Dist.,* 634 F.3d 372, 376 (7th Cir. 2011). "Although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe. [citation omitted]. That is, the court should give credence to the evidence favoring the nonmovant as well as that "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 150–51 (2000). "Although the court examines the evidence to determine whether the jury's verdict was based on that evidence, the court does not make credibility determinations or weigh the evidence." *Schandelmeier,* 634 F.3d at 376.

"[I]nduced infringement under § 271(b) requires knowledge that the induced acts constitute

patent infringement." *Global-Tech Appliances, Inc.,* 131 S.Ct. at 2068. To be liable for inducement, a defendant must have "believed there was a high probability that [the device] was patented, . . . took deliberate steps to avoid knowing that fact, and . . . therefore willfully blinded itself to the infring[ement]." *Id.* at 2072. The defendants argue (or at least seem to be arguing) that, because the jury found that the plaintiff had not proven by clear and convincing evidence that Mr. Krajecki and Mr. Grimsley "knew or should have known of the objectively high risk of infringing a valid patent" [Dkt. # 468, at 8], and thus had not willfully infringed, the finding of inducement cannot stand.

But there is a significant difference between clear and convincing evidence and a preponderance of evidence, which is the burden that must be satisfied in an inducement case. A preponderance of the evidence means only that it is more likely than not something occurred. *Warner-Lambert Co. v. Teva Pharmaceuticals USA, Inc*., 418 F.3d 1326, 1341 n.15 (Fed.Cir. 2005); *In Re Meyers*, 616 F.3d 626, 631 (7th Cir. 2010). On the other hand, clear and convincing evidence has been described as evidence which produces in the mind of the trier of fact an abiding conviction that the truth of a factual contention is highly probable. *Procter & Gamble Co. v. Teva Pharmaceuticals USA, Inc*., 566 F.3d 989, 994 (Fed.Cir. 2009); *United States v. Boos*, 329 F.3d 907, 911 (7th Cir. 2003). There is thus plenty of room for the jury's findings on willfulness and inducement to coexist, and the reliance on the evidence being inadequate to sustain a finding of willfulness (*JMOL*, at 33) is irrelevant to the question of the sufficiency of the evidence of inducement.[7]

---

[7] The Motion pays lip service to the distinction between the two burdens of proof (*JMOL*, at 33) , contending "the standard of proof alone does not justify the jury's finding based on the evidence in this case."

(continued...)

Moreover, the argument for evidentiary insufficiency is based on the tacit assumption that the defendants' evidence was true and that the jury had to accept it, even though "'[t]he drawing of inferences, particularly in respect of an intent-implicating question... is peculiarly within the province of the fact finder that observed the witnesses.'" *Broadcom Corp. v. Qualcomm Inc*.,543 F.3d 683, 700 (Fed. Cir. 2008). *See also Fuji Photo Film Co. v. Jazz Photo Corp*., 394 F.3d 1368, 1378 (Fed.Cir. 2005) (declining to disturb jury's verdict because intent to induce infringement "is a factual determination particularly within the province of the trier of fact"). Thus, the jury was free to disregard the defendants' protestations of innocence and lack of knowledge – the defendants were not exactly "disinterested witnesses," *Reeves,* 530 U.S. at 151 – and credit the Plaintiff's contrary and sufficient evidence that satisfied the "willful blindness" standard.

Even before his November 2006 meeting with Mr. Minemyer, Mr. Maynard, who worked for the plaintiff, told Grimsley that the plaintiff had patents on the features of the B & C coupler. (*Plaintiff's Appendix*, Trial Trans., at 1205). Mr. Grimsley was aware that the plaintiff had patents on a two-piece coupler. (*Plaintiff's Appendix*, Trial Trans., at 1193). Mr. Maynard's letter didn't concern him, but it was a bit confusing because the claims Mr. Maynard spoke of were on "every single coupler that has ever been made . . . ." (*Plaintiff's Appendix*, Trial Trans., at 1206, 1207). Mr. Grimsley did notice that there was a patent number on the one-piece Lozon coupler. (*Plaintiff's Appendix*, Trial Trans., at 1201). He didn't do any "due diligence" on the matter – his characterization – but was sufficiently concerned that he claimed he called Defendant Lundeen who he testified assured him he had shown it to a lawyer and that the patent was referring to a two-piece

[7](...continued)
It is not clear what this means.

28

coupler, as opposed to the accused one-piece product. (*Plaintiff's Appendix*, Trial Trans., at 1207). He didn't do any of his own checking; he simply took Lundeen's word for it. (*Plaintiff's Appendix*, Trial Trans., at 1194, 1208). When the plaintiff wanted to have a meeting with him about the patent, he didn't dodge him. (*Plaintiff's Appendix*, Trial Trans., at 1240).

That was not quite true, but in any event he never told him what he and Lundeen had been doing, how they secretly and slavishly copied his coupler beginning in early 2006, or that he and Lundeen had deceptively lulled plaintiff into not bidding the contract so that they could secure it by bidding the B & C coupler. Mr. Grimsley claimed he didn't know the plaintiff had a patent on a one-piece coupler because such couplers were common in the industry. (*Plaintiff's Appendix*, Trial Trans., at 1242, Ex. 69). Why then he felt the need to supposedly check with Lundeen he did not explain.

Defendants submit that Mr. Grimsley "conveyed all of what he knew about [plaintiff's] patent allegations to the CEO of DuraLine, including the assurances he received form Mr. Lundeen." (*JMOL*, at 32). The defendants, however, do not provide any citation to the record for this evidence, and so their argument is unsupported and waived. "'Judges are not like pigs, hunting for truffles buried [in the record].'" *Gross v. Town of Cicero*, 619 F.3d 697, 702 (7th Cir. 2010). More importantly, it was well within the jury's province to find that Mr. Grimsley was not a credible witness. *Broadcom Corp. v. Qualcomm Inc.*, 543 F.3d at 700; *see also supra* at 9. The jury could easily have concluded that he brazenly lied at his deposition about when the B & C couplers were finally available, and had to recant his story at trial since what he claimed at the deposition had happened, was "not possible." (*Plaintiff's Appendix*, Trial Trans., at 1176-81). And if the jury concluded he lied under oath at the deposition, they could (but were not required to) find that other

aspects of his trial testimony should be rejected as well since perjury is a circumstance to be weighed by the jury in determining a witness's credibility. *Allen v. Chicago Transit Authority,* 317 F.3d 696 (7th Cir. 2003).

The fact that the B & C couplers had not even been produced, as Grimsley was forced to admit at trial, showed that Mr. Grimsley and defendants were bidding a product they didn't have and the evidence, the jury could find, was that they did so with the intent of substituting infringing B & C couplers when they were ready. Lying about the timeline, if the jury so concluded, would certainly indicate that Mr. Grimsley had the "fear" that turns negligence to intent. *Anderson v. Cornejo*, 355 F.3d 1021, 1026 (7th Cir. 1990)(discussing the element of fear that turns negligence to intent). Of course, these were exclusively matters for the jury. The defendants' argument presupposes the truth of their evidence and does not give a nod to the jury's power to have rejected their version of events and view it as "a tale spun for the occasion." *Pickett v. Sheridan Health Care Center,* 610 F.3d 434, 441 (7th Cir. 2010). This very point was made prior to the JMOL motion, *see Minemyer v. R-Boc Representatives*, Inc., __F.Supp. 2d __, 2012 WL 512397, 12 (N.D.Ill. 2012), yet continues to be ignored by the defendants, who take the evidence not in a light most favorable to the plaintiff but to themselves.

Defendants' argument about Mr. Krajecki is the same. But Mr. Krajecki plainly knew of the patent once he was sued, yet he continued to have his company make and sell the infringing B & C couplers for years after that. (*Plaintiff's Appendix*, Trial Trans., at 646-47). And, Mr. Krajecki certainly had his suspicions: he called Mr. Lundeen to ask whether the part he was making infringed a patent before he embarked on the project. (*Plaintiff's Appendix*, Trial Trans., at 677-78). Like Mr. Grimsley, he claimed he took Mr. Lundeen's word that it wasn't and made no inquiry or

investigation of his own. (*Plaintiff's Appendix*, Trial Trans., at 679-80). Even after he was sued, once again, he put all his trust in Mr. Lundeen that the patent was for a different type of coupler, a two-piece coupler and made no investigation himself. (*Plaintiff's Appendix*, Trial Trans., at 682)

In sum, the evidence was sufficient to show by a preponderance that, at a minimum, Mr. Grimsley and Mr. Krajecki were willfully blind to the high probability that the B & C coupler that they were selling and manufacturing infringed the plaintiff's patent. Even crediting the defendants' testimony, the evidence showed that rather than seeing for themselves, they took Mr. Lundeen's word for it and made a leap of unwarranted faith. But "In Lundeen We Trust" is not enough. The two men weren't merely ignorant, they knew there was a danger they were involved in infringement, otherwise they wouldn't have been prompted to ask Mr. Lundeen about it. *Anderson*, 355 F.3d at 1026 (discussing the element of fear that turns negligence to intent). Defendants point to no case suggesting that reliance on one's supplier is automatically sufficient. It is not. *Cf., United States v. Abuarquob*, 294 Fed.Appx. 722, 725,n.3, 2008 WL 4447615, *3 (3rd Cir. 2008)(defendant's claim that he relied on assurances of his supplier that product he was selling was FDA-approved was "insufficient to overturn a well-reasoned jury verdict.").

**CONCLUSION**

The defendants' motion for judgment as a matter of law [#453, 454, 455, 456, 457, and 478]

is GRANTED in part and DENIED in part.

ENTERED:_____
UNITED STATES MAGISTRATE JUDGE

DATE: 6/13/12